**ORE–IDA POTATO PRODUCTS, INC.**
**and Oregon Frozen Foods Co.,**
**Petitioners,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 16777.**

United States Court of Appeals
Ninth Circuit.

Nov. 30, 1960.

Eli Weston, Boise, Idaho, Gallagher & Gallagher, Ontario, Or., for petitioners.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Marion L. Griffin, Attys., N. L. R. B., Washington, D. C., for N. L. R. B.

Before POPE, HAMLEY and HAMLIN, Circuit Judges.

HAMLIN, Circuit Judge.

This is a petition by Ore-Ida Potato Products, Inc. and Oregon Frozen Foods Co., hereinafter called the petitioners or the companies, to review and set aside an order of the National Labor Relations Board. This court has jurisdiction of the proceeding under 29 U.S.C.A. § 160(e) and (f).

Fern Miller had been an employee of the companies since 1951. On December 13, 1958, she was discharged. The Board found that the companies had violated 29 U.S.C.A. § 158(a) (1) and (3) by discharging her because of her union activities. The only issue before this court is whether there is substantial evidence upon the record as a whole to support the Board's finding that the companies have engaged in unfair labor practices by discriminating against Miller in violation of § 158(a) (1) and (3).

The record shows that for almost a year the union of which Miller was a member [1] had been attempting to organize the petitioners' plants. In January, 1958, it was unsuccessful in its campaign to win an election held in the plant under the supervision of the Board. However, the Board later set the election aside because of certain actions by the petitioners which had "made a fair election impossible." Ore-Ida Potato Products, Inc., 121 N.L.R.B. 40 (1958). Another election was ordered by the Board; it was held in October, 1958; and the union was again defeated. Shortly prior to this second election a new grievance committee was organized, some members of which were selected by the workers. Miller was elected to this committee by the employees of the day shift packaging department. She was described as the Union's "official representative * * * in the plant" by one witness and has been described by petitioners as "the Union's most enthusiastic champion and ambassador among the other employees."

In November, 1958, Miller went to the vice-president of one of the petitioners to inquire about the authority of a lineman (the supervisor immediately in charge of each packaging line). She was told that since the second Board election the authority of the linemen had been increased and that they had authority to transfer employees from one job to an-

1. Amalgamated Meat Cutters and Butcher Workmen of America, AFL–CIO.

other and to discharge them. After this incident Foreman William J. Berry told Miller that she had no right to take anything up to the office without his "o.k." He said that in the army that would be insubordination and that she had no right to go over his head. Before this incident, Berry's relations with Miller were friendly, but afterward "he never spoke to me * * * except when it was necessary."

The petitioners offered testimony to the effect that the reason for Miller's discharge was that she was causing trouble, constantly talking on the job, bothering the other workers, and had been given several warnings and opportunities, but failed to reform. This testimony was contradicted by Miller and some of her fellow employees who testified that she was a good worker. It was also established that Berry, the star witness for the petitioners, made a written statement before an agent of the NLRB prior to the hearing before the Board saying, among other things, "I would have no objections to Miller's reinstatement—she was as good a worker as there was in the place."

The petitioners also produced witnesses who testified that Miller had been tardy frequently and that she had "jammed her machine as much as five-ten times in a day." They also offered in evidence some cards containing entries by the supervisors showing complaints about Miller's conduct. As is usual, there was a conflict in the evidence as to Miller's claimed delinquencies. The Trial Examiner chose to place more reliance upon the General Counsel's witnesses than upon petitioners' witnesses. Specifically, he

found that all six card entries showing complaints about Miller's conduct, although dated before Miller's discharge, had actually been executed after Miller's discharge. He found "there is nevertheless ample reason to conclude that the cards are no more than afterthoughts improvised at one point or another after the dismissal, whether before or after the service of the charge, for such 'need' as might arise 'in a situation' such as this proceeding." [2]

The Trial Examiner made a detailed analysis of the testimony offered by both sides. It is not necessary for us to here set out all of his findings, but an illustration of the way he viewed the testimony of the parties is contained in the following excerpt:

"* * * In sum, I am persuaded that Miller was never reprimanded for tardiness, as she testified; that tardiness was not a factor in her discharge; and that the claims imputing tardiness characteristics to Miller are an afterthought, like the complaint cards signed by Simon and the testimony of Berry and Simon imputing insubordination, inefficiency, inattention to duty, and responsibility for machine jamming to Miller, prior to December 13, 1959 (sic) * * *. The sum of the matter, in the light of what has been said concerning the credibility of Berry and Simon, is that the reasons for Miller's discharge put forward by the Respondents do not survive scrutiny * * *. The real reason emerges upon consideration of the setting of the discharge, viewed against the background of the Respondent's hos-

2. The testimony of Leon W. Hammer, a lineman who signed some of the complaint cards, supports the Board's contention that the complaints were filed after the discharge.

"Q. Mr. Hammer, I am going to show you some cards here that are marked General Counsel's Exhibit #3 and ask you if you signed these cards? A. Yes.

"Q. Do you recall the occasion when you signed this? A. I don't remember the date.

"Q. They are dated 11–7–58 and 11–10–58. Did you sign them on 11–7–58 and 11–10–58? Do you know or do you recall when you signed them? A. No sir.

"Q. Do you recall the date that Fern Miller was discharged? A. Just from what I have heard, December 13.

"Q. These cards then dated November 7th and 10th did you sign these cards before December 13? A. No sir.

"Q. Then when did you sign them? A. After she was discharged.

tility toward the free exercise by their employees of rights guaranteed by Section 7 of the Act."

There was testimony which would establish that about two weeks after the claimed insubordination incident Foreman Berry told another employee that there were "approximately five and possibly eight in the packaging room" who were going to be discharged, and that Fern Miller and another employee, Bernice Johnson, "had better watch their step" or "they would have to go." In a later conversation, Berry told the same employee that he was going to "clean up the union representatives," and that he was "waiting" for Miller and Johnson "to make a caboble [mistake] and he was going to fire them both."

On December 13, 1958, in the plant packaging room, at about 12:30 p. m., Foreman Berry discharged Johnson and ordered her to report to the personnel office for her pay check. Johnson on her way out, told Miller that she had been discharged, and Miller offered to get her "that address," referring to the address of an office of the National Labor Relations Board. Johnson replied that she would like to have it. Thereafter, Johnson went back to Berry to ask him to give her the reasons for her discharge. After she and Berry had finished discussing her discharge, the lunch hour having begun, she went to the plant lunchroom to get the Board's address from Miller. Berry entered the lunchroom immediately behind Johnson and was standing five or six feet away when Miller gave her a piece of paper which contained the address of the Board office. Some of the women employees, including Miller, were weeping because of Johnson's discharge, and Berry told Johnson to go to the personnel office. Miller testified that he then turned to her and said, "Fern, would you like to go up and see Bob Ryan [the personnel officer]?" She answered, "That's up to you." Berry's reply was to tell her to go to the personnel office.[3] Johnson's check was ready at the per-

sonnel officer's office when he returned from lunch, but Miller's check was not prepared until after 3 o'clock that afternoon.

Although denied by the companies, there is sufficient evidence in the record to support the Trial Examiner's conclusion that Berry did not intend to fire Miller when he went to the lunchroom. He sent her to the personnel office after she had shown sympathy for Johnson, and the words that he used disclose that rather than firing her according to a preconceived plan, he fired her only when he saw that she was comforting his enemies. The Trial Examiner's finding is also supported by the fact that though Johnson's check was ready, Miller's was not. It would seem reasonable to assume that if the decision to discharge Miller had been made earlier in the morning as the companies claim, at approximately the same time that the decision was made to fire Johnson, both of the checks would have been prepared.

The petitioners rely on N. L. R. B. v. Birmingham Publishing Co., 5 Cir., 1958, 262 F.2d 2, 8. There, the Court said:

> "This Court has held that 'the burden is on the Board to prove and not on the employer to disprove the presence of anti-union animus or other prohibited discriminatory motivations in hiring and firing'. * * *

> "If a man has given his employer just cause for his discharge, the Board cannot save him from the consequences by showing that he was pro-union and his employer anti-union. We have no doubt that the Birmingham Publishing Company was glad to get rid of Edwards. But the Company has a right to operate its plant efficiently. If an employee is both inefficient and engaged in union activities, that is a coincidence that does not destroy the just cause for his discharge."

---

**3.** It was mutually understood that in ordering her to the office, Berry was discharging Miller.

Conceding the above statement to be the proper rule, we cannot say after an examination of the entire record that the Board has not met the burden of proving that Miller was discharged because of her union activities and not because of the claimed delinquencies in her work.

Let the order of the Board be enforced.