**L'EGGS PRODUCTS, INCORPORATED,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 78–2387.**

United States Court of Appeals,
Ninth Circuit.

May 30, 1980.

---

Stanley E. Tobin, Hill, Farrer & Burrill, Kyle D. Brown, Los Angeles, Cal., for petitioner.

David A. Fleischer, N. L. R. B., Washington, D. C., for the N. L. R. B.

Before DUNIWAY and CHOY, Circuit Judges, and PALMIERI,* District Judge.

DUNIWAY, Circuit Judge:

L'Eggs Products, Incorporated petitions for review of an order of the National Labor Relations Board, and the Board cross-petitions for enforcement of its order. The Board adopted the findings, conclusions and proposed order of its Administrative Law Judge. The decision is reported at 236 N.L. R.B. 354 (1978). We set aside the order in part, affirm it in part, and remand to the Board for further proceedings. We also deny, but refer to the Board on remand, L'Eggs' motion for leave to adduce additional evidence before this court.

I. *Background Facts.*

L'Eggs is a manufacturer and distributor of women's hosiery. Its products are distinctively packaged and are displayed in such stores as supermarkets and superdrug-stores in unique racks which it calls "bou-tiques." The packaging, the racks, and advertising sell the product. The business of monitoring and replacing stock in the racks and keeping them neat and clean, so that they will attract customers, is conducted by route sales representatives (RSRs) employed by L'Eggs. They are provided with vans and uniforms, and work under the supervision of Area Managers.

The case concerns L'Eggs' sales district covering southern California and part of Nevada, with headquarters in Buena Park, California. At the time in question, there were 40 RSRs in the district, and on January 19, 1976, Retail Clerks Union Local 770 sent to L'Eggs' Western regional manager, Schwaegler, by certified mail, a letter signed by 13 of these RSRs stating that they were "actively engaged in an organizing program to obtain a union contract." The letter concluded "We would caution you to refrain from any interference or restraint of your employees' right to self-organization." It was received by Schwaegler on January 21.

The reaction of L'Eggs was immediate and effective, and resulted in charges filed with the Board that gave rise to this proceeding. The Company's position was stated by its Senior Vice President, Sales and Distribution, Engle, the self-described creator of the business, at a dinner meeting of all the RSRs in the district on February 5, 1976: "It is . . . our intention to oppose this Union and by every lawful and proper means to prevent it from coming into this operation." One question presented is whether the Company went beyond this expressed intention and committed unfair labor practices.

We will state additional facts as we consider each of L'Eggs' principal arguments.

II. *The Discharges.*

Five employees were discharged, one, RSR LuAnn Morgan, on November 20,

---

* The Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

1975, one, RSR Jackie Wade Smith, on January 26, 1976, and three others, not RSRs, on January 27, 1976. As to one of the three, the general counsel dropped the charge; as to the other two, the AL Judge found the discharges lawful. The Board has accepted the AL Judge's decision as to these three employees. It also accepted the decision that L'Eggs discharged Morgan and Smith because of their union activities.

## A. *The Standard for Decision.*

■ We cannot overturn the Board's decision if it is supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB,* 1951, 340 U.S. 474, 487–488, 71 S.Ct. 456, 463–464, 95 L.Ed. 456. Nor can we reject the Board's choice between fairly conflicting views even though we would have made a different choice had the matter been before us originally. *Id. See, also, NLRB v. Walton Mfg. Co.,* 1962, 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829.

Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), makes it an unfair labor practice for an employer "by discrimination in regard to . . . tenure of employment to . . . discourage membership in any labor organization." Firing an employee for supporting a union violates this provision.

■ An employer may discharge an employee for good cause, bad cause, or no cause at all, without violating § 8(a)(3), as long as his motivation is not antiunion discrimination and the discharge does not punish activities protected by the Act, *NLRB v. Ayer Lar Sanitarium,* 9 Cir., 1970, 436 F.2d 45, 49. It follows that the Board has the burden of proving that a discharge was motivated by antiunion animus. *NLRB v. Klaue,* 9 Cir., 1975, 523 F.2d 410, 413. A business reason for a discharge cannot be used as a pretext. *Ayer Lar Sanitarium, supra,* 436 F.2d at 50. A discharge for which the employer has a justifiable ground violates § 8(a)(3) if it is in fact motivated by

antiunion sentiment. *NLRB v. Western Clinical Laboratory, Inc.,* 9 Cir., 1978, 571 F.2d 457, 459. Proof that the employer knew about the employee's union activities is a prerequisite to a finding that a discharge violates § 8(a)(3). *Brooks v. NLRB,* 9 Cir., 1976, 538 F.2d 260, 261; *NLRB v. Klaue, supra,* 523 F.2d at 413.

In this circuit, the test for determining whether a discharge violates § 8(a)(3) has changed over the last several years. In *NLRB v. Ayer Lar Sanitarium, supra,* 436 F.2d at 50, we said that the "test is whether the business reason or the . . . union activity is the moving cause behind the discharge. . . . In other words, would this employee have been discharged *but for* his or her union activity?" (emphasis in original). In *NLRB v. Central Press of California,* 9 Cir., 1975, 527 F.2d 1156, 1158, we upheld the Board's finding of a violation because it found that a discharge was *at least partially motivated* by the union sympathy of the employee, (citing similar language in *NLRB v. Ayer Lar Sanitarium, supra.*) In *Western Exterminator Co. v. NLRB,* 9 Cir., 1977, 565 F.2d 1114, 1118, however, we said that where a discharge is motivated by both a legitimate business consideration and protected union activity, the test is which "is *the moving cause* behind the discharge" (emphasis added). We also said, "[w]here a party has two motives, one permissible and the other impermissible, the better rule is . . . that the improper motive must be shown to have been *the dominant one.*" (emphasis added) *Accord: Hambre Hombre Enterprises, Inc. v. NLRB,* 9 Cir., 1978, 581 F.2d 204, 207 n.4; *Stephenson v. NLRB,* 9 Cir., 1980, 614 F.2d 1210, 1213; *NLRB v. BigHorn Beverage,* 9 Cir., 1980, 614 F.2d 1238, 1242; *NLRB v. Best Products, Inc.,* 9 Cir., 1980, 618 F.2d 70, (1980); *Stephens Institute v. NLRB,* 620 F.2d 720 (9 Cir. 1980).

There is one recent decision that appears to adopt a less stringent test in discharge cases, *NLRB v. Lantz,* 9 Cir., 1979, 607 F.2d 290, 299. *Lantz* distinguishes *Western Ex-*

*terminator Co.* as involving "an isolated discharge of a single employee, where the action of the employer was not 'inherently destructive' of § 7 rights." The opinion then cites *Portland Willamette Co. v. NLRB*, 9 Cir., 1976, 534 F.2d 1331, as listing "examples of inherently destructive activity which included 'permanent discharge for participation in union activities,'" and concluded that inherently destructive activity was involved in *Lantz*, so that *Western Exterminator Co.* does not apply. In *Lantz* we defined the test as that the discharge be "at least partially" for union activity, but that that motivation need not be dominant. We do not understand the distinction made in *Lantz* because the discharge in *Western Exterminator* was just as "permanent" as in *Lantz*. Our latest decisions, cited *supra*, follow *Western Exterminator Co.* and do not cite *Lantz*. We conclude that *Lantz* should be confined to its facts—discharges for seeking to enforce the contract between the employer and the union. That is not involved here. Therefore, in considering the two discharges here involved, we apply the *Western Exterminator Co.* test.

## B. *The Discharge of Morgan.*

■ The AL Judge found that Morgan was discharged because of her support of unionism, and the Board adopted his position. L'Eggs mounts a vigorous attack on this decision.[1] Its strongest points are two. One is that the discharge occurred on November 20, 1975, well before there was any organized effort in behalf of the union. The other is that Morgan's work performance was poor, and would justify her discharge.

On the other hand, the discharge occurred very soon after L'Eggs received reports that Morgan was interested in unions and would support a union for RSRs at L'Eggs.

In the first half of November, 1975, RSRs Morgan, Quigley and Michaels and warehouseman Dennis Potter were at the balance point[2] in San Diego. Morgan asked Potter about unions, because her boyfriend was considering a job where there was a union. Nothing was said about a union at L'Eggs. Nevertheless, not long after, Potter received a telephone call from Area Manager Hetherington, Morgan's supervisor, who said that an RSR had told him that Potter had been talking to the RSRs about the union. He asked Potter whether RSRs were trying to organize San Diego and what Morgan had said. Potter said that he did not think that anything was going on, and that one RSR had merely inquired on behalf of her boyfriend.

Morgan had been assigned to a training seminar because her performance rating for October was unsatisfactory. During lunch with other RSRs on Friday, November 14, 1975, Morgan, who was the only San Diego RSR at the seminar, said that RSRs' pay and benefits were inadequate and working conditions poor and suggested that they consider unionization. Another RSR, Arlene Hungate, stated loudly that she would not join a union. That evening, Hungate phoned her Area Manager, Deanna Manning, and said that Morgan had expressed an interest in the Union. Hungate added that she would quit if the Company went union.

On Sunday, November 16, Hetherington phoned RSR Mary Ann O'Malley, who had been present when Morgan discussed unions at the balance point in early November. O'Malley was not a union supporter, and was a good friend of Hetherington. Hetherington asked O'Malley whether she had been approached by anyone in the Union. O'Malley mentioned the balance point conversation and asked why Hetherington

---

1. L'Eggs' brief is written in the vocative. It would have been more persuasive if it were less shrill.

2. The balance point is a place to which RSRs report each week to turn in their paper work, receive supplies for the following week, and meet individually with the area manager, who reviews each RSR's performance and paper work, and conditions on her route.

wanted to know. Hetherington replied that at the training seminar one RSR had mentioned the Union to another, and the latter had told her superior that she would quit if the Company went union. O'Malley asked whether the second RSR was Majo Michaels. Hetherington said that it was not Michaels, but that a San Diego RSR had told an RSR from another area that if the Company went union, all the San Diego RSRs would join. Morgan was the only San Diego RSR to attend the training seminar, and O'Malley knew this. Hetherington said that his supervisor had told him to find out who had been talking about the Union and to get rid of her. During this conversation, Morgan's name was mentioned. On November 20, Hetherington told Morgan that she was terminated because her work was unsatisfactory.

L'Eggs' position is that the Hetherington-O'Malley conversation did not occur on November 16 but a week later, on November 23, after Morgan was fired, and that Hetherington never said that he had been told by his superior to find out who this girl was and, whoever she was, to get rid of her. All of L'Eggs' officials testified that they knew nothing about Morgan or her union sentiments before the discharge; the officials from Winston-Salem headquarters testified that they had never heard of her until a charge was filed on her behalf in February, 1976.

If the number of witnesses making an assertion were the test, L'Eggs would win, hands down. But neither the AL Judge nor the Board nor this court is required to accept the self-serving declarations of L'Eggs' management personnel. *Shattuck Denn Mining Corp. v. NLRB*, 9 Cir., 1966, 362 F.2d 466, 470. Here, the AL Judge believed O'Malley, and his reasons for doing so are quite sensible. L'Eggs relies heavily on Hetherington's testimony that his conversation with O'Malley was on November 23, and on O'Malley's affirmative answer to a cross-examiner's favorite question, "is it possible that?" the conversation occurred on

the 23rd. Overlooked, however, is the fact that thereafter O'Malley reiterated her conviction that the conversation was on the 16th, just two days after Morgan's lunchtime remarks, and stated her reasons, which are persuasive. In addition, she is partly corroborated by Hetherington himself, and by other witnesses whom the AL Judge found to be credible as to these matters.

Hetherington's statement to O'Malley on November 16, that his supervisor had told him to find out who had been talking about the union and to get rid of her, was "an outright confession of unlawful discrimination. It eliminated any question concerning the intrinsic merits as to . . . the . . . dischargee [Morgan], . . . or other causes suggested as the basis for the discharge." John R. Brown, J., in *NLRB v. Ferguson*, 5 Cir., 1958, 257 F.2d 88, 92. *See also Ore-Ida Potato Products, Inc. v. NLRB*, 9 Cir., 1960, 284 F.2d 542, 545. Obviously, it was of no moment to Hetherington's supervisor that Morgan was or was not a good employee. The supervisor was single-minded, wanting the girl identified and gotten rid of, whoever she was, and whatever her job performance, solely because she was a union supporter.

The AL Judge spent a lot of time hearing, sorting out, and analyzing a mass of evidence as to how good or bad an employee Morgan was. In the briefs, much of this evidence is rehashed again. We find it unnecessary to resolve the parties' disagreements about the issue. There is little doubt that Morgan was a poor employee, and could have been fired for that reason. On the other hand, there is also evidence indicating that she was not so bad as L'Eggs would have us believe. Otherwise, why was L'Eggs spending time and money giving her further training in an effort to improve her performance? But we conclude, in the light of the instruction that Hetherington had from his supervisor, that the issue is a false one in this particular case. The Board's decision and order, as they relate to the discharge of Morgan, are supported by

substantial evidence on the record considered as a whole.

## C. *The Discharge of Wade (Smith).*

■ The signature of Jackie Wade, later, by marriage, Jackie Smith, was at the top of the signatures of RSRs in the Union's letter of January 19, 1976. L'Eggs received the letter on January 21. Wade was fired on January 26. The short time between L'Eggs' receipt of the letter and Wade's discharge is the strongest bit of evidence supporting the Board's conclusion that she was fired because of her union activity. The company's strenuous opposition to any RSR union provides some further support for the same conclusion. But in Wade's case we are not persuaded that substantial evidence, on the record considered as a whole, supports the Board's conclusion that she was fired because of her support of the Union. L'Eggs' evidence overcomes the general counsel's prima facie case.

As in the case of Morgan, there is considerable evidence that Wade was a poor RSR, to the degree that L'Eggs had ample cause to discharge her. Again there is also evidence that she was not as poor an employee as L'Eggs now claims that she was. But there is more than one respect in which the evidence relating to Wade is sharply different from that relating to Morgan. There is no confession by any supervisor that the motivation was antiunion bias. There is documentary evidence, not materially contradicted by other evidence, that L'Eggs had decided to fire Wade before it had any knowledge of her union activity, that it had decided to do the firing on January 22, 1976, and that it postponed it only because it received the Union's January 19 letter on January 21. At that point, L'Eggs' management at once realized that her discharge could immediately be claimed to be an unfair labor practice. Therefore, a decision was made to postpone the discharge, to have Sue Smith, her Area Manager, do an inspection of various stops on Wade's route, and if the conditions there had not improved, discharge her. The inspection was done; it showed that conditions were worse, not better, and Wade was fired.

Wade had been an RSR since 1973, and until mid 1975 her performance had been satisfactory. In July, 1975, she was denied a leave of absence because of her poor performance. Sue Smith became her Area Manager (supervisor) in mid 1975, and assigned Wade a September 6 deadline for cleaning her boutiques. Smith was considering firing Wade if her performance did not improve. Thereafter, Wade received an "unsatisfactory" written evaluation from Smith, who next put her on a 30 day probation. By December, Wade's performance was such that Smith thought she should be replaced. All of this is supported by contemporaneous documentation, well before there was any hint of unionization. So Smith put an ad in a local paper, on December 14, 1975, for an RSR to handle the West (San Fernando) Valley area. This was Wade's territory. The AL Judge misread this advertisement as for the "Central Valley," which would include much more than Wade's territory, and dismissed it from consideration on that ground. This simply will not do.

Smith discussed Wade's termination with her supervisor, Hardy. They agreed that Wade would be terminated after the holiday season. This is from Thanksgiving until after the New Year, and is L'Eggs' busiest season. The workload for RSRs is heaviest at that time, and some RSRs quit. When that happens, L'Eggs hires replacements. But during that period it has never fired an RSR, because, during that time, a poor RSR is better than none, and better than a replacement, who would have to be trained, and it has hired very few, all replacements for quits. Disregarding this uncontradicted evidence, and relying on evidence that L'Eggs did hire replacements for RSRs who quit, the AL Judge elected to disbelieve the testimony that Wade's termination was to be postponed until after the holiday season. This, too, will not do.

On December 18, Smith conducted a routine supervision of Wade, and found her performance unsatisfactory. However, she gave her a "satisfactory" rating, the lowest passing one, because she didn't want Wade to go during the holiday season. She feared that Wade would quit if given a lower rating, because of her attitude. This, too, is contemporaneously documented. This, too, was disregarded by the AL Judge, and this, too, will not do. There is further documentation of Wade's poor performance, by Warehouse Manager Batty, on December 22.

Wade's performance was subject to annual review in January, the month in which she was employed. Smith worked on this during the week of January 12. On Friday, January 16, she told Hardy that the result was unsatisfactory. Smith was to be away on Monday and Tuesday, January 19 and 20. Wednesday the 21st was balance day. So it was agreed that the discharge was to be January 22, a Thursday. The AL Judge concluded that it was "not beyond the realm of possibility" that all of this was fabrication. Yet the decision is corroborated by the notes made contemporaneously by Hardy. "Not beyond the realm of possibility" is not a standard at all and has no meaning as a basis for evaluating conflicting evidence. The AL Judge's reasons for disregarding these handwritten memos are unsatisfactory.

He also disregards, for reasons we cannot accept, Price's notes of January 21 of a phone call received from Schwaegler which says, among other things, "Jackie [Wade] Smith is scheduled to be fired tomorrow—poor performance—Documentation?—Yes—Hardy said wait—Hold off 'till I get back —." We can see no basis in the record for the AL Judge's doing so. He also downplays the December 14 advertisement, because L'Eggs did not promptly follow up after the holiday season, yet there is a memo by Smith, dated January 20, stating "Mailed out applications to those who answered the December ad in the Valley." This, too, the AL Judge disregards.

We conclude that substantial evidence, on the record as a whole, compels the conclusion that "the moving cause behind the discharge"—"the dominant cause"—was Wade's poor performance, not her support of the Union. The portion of the Board's order holding that her discharge was an unfair labor practice, and requiring that she be offered reinstatement and back pay must be set aside.

## III. *The Other Unfair Labor Practices.*

■ The Board held that L'Eggs had committed unfair labor practices by interrogating employees concerning their union sympathies and those of fellow employees, by creating the impression of surveillance of their union activities, by threatening them with discharge, more onerous working conditions, and loss of benefits, by soliciting employees to revoke their union authorization cards and withdraw their support from the union, and by soliciting, encouraging and assisting employees to engage on L'Eggs' behalf in surveillance of the union activities of other employees, all in violation of § 8(a)(3) and (1) of the Act. We hold that the AL Judge's findings as to these practices, adopted by the Board, are supported by substantial evidence on the record considered as a whole.

As we have mentioned, L'Eggs' reaction to the Union's January 19 letter was immediate. The Western Regional Manager, Schwaegler, received the letter on January 21. He phoned Price, Director of Field Personnel, at the Winston-Salem, North Carolina headquarters, on that day. Plans of those concerned to go to a Company wide meeting in Puerto Rico were thereupon cancelled, and the next day four of the top brass in L'Eggs' headquarters, Engle, Senior Vice President, Sales and Distribution and International Operations, Price, Radcliffe, Vice President of Employee Relations, and Caldwell, Vice President of Sales and Distribution, flew to Buena Park.

They and Schwaegler conferred separately with Hardy, District Manager for Southern California, and separately with Hardy's

four Area Managers, Manning, Smith, Johnson and Hetherington. Each manager was shown the Union's January 19 letter. Hardy was asked for his views about every RSR in the district and whether she would support the Union. As to each RSR who had signed the letter, he was asked why she had done so. Similar questions were put to each Area Manager about the RSRs under that manager's supervision. There was a second meeting between the Winston-Salem officials, Schwaegler, Hardy and the four area managers on Friday, January 24. Vice President Radcliffe told each Area Manager to meet individually with each of his or her RSRs and tell them about a planned nationwide wage increase and about L'Eggs' knowledge of and opposition to the attempt of the Union to organize the RSRs.

The area managers carried out these instructions within the next few days. In their sessions with particular RSRs, each of which was different, certain types of questions were asked, such as, had the RSR been approached by the Union, if so, who had approached her, had she signed a union card, what had union representatives told her, who were other RSRs who supported the Union, was she for or against the Union, if she was for it, why hadn't she come to her supervisor instead of the Union. Many RSRs were told that if the Union got in, they would "probably" or "possibly" or "most likely" be paid on an hourly basis, have to punch a time clock, no longer be able to take their vans home, and not be supplied with uniforms. One RSR was told there would no longer be merit increases, and that the Union would not allow her to take time off to go to her doctor, despite her blood problems. A similar statement about time off was made to another RSR. To some who had signed the letter or admitted signing a card, the suggestion was made that they could withdraw from the Union and revoke their signatures. Some did revoke, one or two with active assistance from the supervisor.

█ Although it is not an unfair labor practice for an employer to inform employees that they have a right to revoke their union support, it is an unfair labor practice actively to solicit revocations in an otherwise coercive atmosphere. *See NLRB v. Sky Wolf Sales*, 9 Cir., 1972, 470 F.2d 827, 829. It is also an unfair labor practice for an employer to directly aid employees in revoking their union authorization. *See NLRB v. Deutsch Company Metal Compartments Div.*, 9 Cir., 1971, 445 F.2d 902, 906. *See also NLRB v. Triumph Curing Ctr.*, 9 Cir., 1978, 571 F.2d 462, 470.

Two RSRs who held strongly antiunion views put on an antiunion telephone campaign. They got RSRs' phone numbers from Price, the Winston-Salem officer who had remained in Buena Park during the antiunion campaign, and from Area Manager Johnson. Price and Johnson gave one of them time off to campaign. After each call, the substance of the conversation was relayed to Price. When the campaign was over, each submitted a bill for the cost of her phone calls, which L'Eggs paid. The two RSRs asked questions and made statements in a less inhibited manner than the Area Managers did. They persuaded at least 6 RSRs to revoke their union cards.

The record shows, and Senior Vice President Engle emphasized this in his February 5 speech to all RSRs, that the freedom of RSRs to take their vans home with them and set their own hours of work, doing the job on their own time, is of great importance to them. If they had to punch a time clock and bring their vans to Buena Park and leave them there every day, some would even have to quit. No doubt this is why the hourly pay, time clock, check in the vans theme runs so strongly through the company's campaign. Engle himself emphasized it—indeed, threatened it—in answer to questions after he made his speech to all RSRs.

Hetherington's statement to O'Malley that his supervisor had told him to find the girl who had been talking about the union and get rid of her is a clear threat of discharge, and so an unfair labor practice.

*NLRB v. Magnusen,* 9 Cir., 1975, 523 F.2d 643, 645. Having every area manager interview every RSR about the union and the employee's attitude toward it, their participation in it, and who else was participating is in itself a threatening and coercive performance. Many of the questions asked and statements made added to the coercive atmosphere. *NLRB v. Miller Redwood Co.,* 9 Cir., 1969, 407 F.2d 1366, 1368. *See also NLRB v. Super Toys, Inc.,* 9 Cir., 1972, 458 F.2d 180, 182–183.

The repeated statements by the Area Managers regarding punching time clocks, being paid on an hourly basis, and not being able to take vans home were threats to deprive the RSRs of benefits, and coercive. It is no defense that such words as "possibly" or "might" or "probably" were used. The consequences referred to were within the control of L'Eggs. *NLRB v. Gissel Packing Co.,* 1969, 395 U.S. 575, 618–619, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547.

█ In short, we sustain all of the Board's findings and conclusions as to unfair labor practices other than discharges, save one. We cannot agree that it was an unfair labor practice for the area managers to tell the RSRs that L'Eggs would use "every lawful means possible to avoid unionization." This, however, is of little importance. There were plenty of other unfair labor practices.

## IV. *The Order to Bargain.*

The Board ordered L'Eggs to bargain with the Union, although there had been no election. We conclude that, in this case, that portion of the Board's order should be set aside and remanded to the Board for further consideration.

### A. *The standard.*

The Supreme Court, like the Board, recognizes that "secret elections are generally the most satisfactory—indeed the preferred—method of ascertaining whether a union has majority support." *NLRB v. Gissel Packing Co., supra,* 395 U.S. at 602, 89 S.Ct. at 1934. But an authorization-card majority may suffice where an employer has engaged in "conduct disruptive of the election process." *Id.* There is no point in an election if an employer's unfair labor practices have made the result a foregone conclusion. An employer will not be allowed to gain the benefit of its unfair practices and thus to thwart its workers' desire to bargain collectively.

In *Gissel,* the Court established three categories of unfair labor practices, in relation to bargaining orders: (1) those which are "outrageous" and "pervasive," the effects of which cannot be remedied by less extreme measures, where bargaining orders can be issued without prerequisite (*id.* at 613–614, 89 S.Ct. at 1939–1940); (2) "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes," where bargaining orders may be issued if the union at one time had a valid card majority (*id.* at 614–615, 89 S.Ct. at 1940); and (3) cases of "minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order" (*id.* at 615, 89 S.Ct. at 1940).

The Board does not directly assert that this case falls within the first category. And we do not think that it can fairly be said to fall within the third category. The AL Judge and the Board obviously thought that the case falls within the second category, witness the attention given to the union's pre-unfair labor practice card majority. The question is, were L'Eggs' unfair labor practices such as to "undermine majority strength and impede the election processes?"

### B. *Did the union have majority support?*

█ It is necessary to consider this question, because if the union did not "at

one point [have] a [valid card] majority," 395 U.S. at 614, 89 S.Ct. at 1940, no bargaining order should issue. The Supreme Court's second category conditions a bargaining order on such a valid majority.

### 1. The standard.

*Gissel Packing Co., supra,* provides the standard. "[E]mployees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent by words calculated to direct the signer to disregard and forget the language above his signature." (395 U.S. at 606, 89 S.Ct. at 1936.)

In considering the application of this standard, the Court also said:

> We also accept the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of § 8(a)(1). We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry. (*Id.* at 608, 89 S.Ct. at 1937, footnote omitted)

The Court also quoted, with approval, from *Levi Strauss & Co.,* 1968, 172 N.L.R.B. No. 57, 68 L.R.R.M. 1338, 1341 and n. 7, as follows:

> Thus the fact that employees are told in the course of solicitation that an election is contemplated, or that a purpose of the card is to make an election possible, provides in our view *insufficient* basis in itself for vitiating unambiguously worded authorization cards on the theory of misrepresentation. A different situation is presented, of course, where union organizers solicit cards on the explicit or indirectly expressed representation that they will use such cards *only* for an election . . . . (emphasis in original)

\* \* \* \* \* \*

It is not the use or nonuse of certain key or "magic" words that is controlling, but whether or not the totality of circumstances surrounding the card solicitation is such, as to add up to an assurance to the card signer that his card will be used for no purpose other than to help get an election. (*id.* at 608, fn. 27, 89 S.Ct. at 1937)

We have applied these principles. *See, e. g., NLRB v. South Bay Daily Breeze,* 9 Cir., 1969, 415 F.2d 360, 365–367.

### 2. The questioned cards.

There were 39 RSRs, not counting Jackie Wade. Thus, 20 is a majority, and the union had 22 cards, again, not counting Wade's card. The cards all stated, unequivocally:

> Desiring to enjoy the rights and benefits of collective bargaining, I, the undersigned, employee of _____
> company name
>
> _____
> address city
> hereby authorize Retail Clerks Union Local 770 to represent me for purposes of collective bargaining, respecting rates of pay, wages, hours of employment, or other conditions of employment.
>
> _____ _____
> Date Signature of Employee"

Before the AL Judge, the company attacked six of the 22 cards. He found that one was invalid, and the Board accepts that finding, but that the other five were valid. Here L'Eggs attacks his findings as to four cards. If two of these were invalid, the Union did not have a majority. We consider each separately.

### (a) Janice Weber.

Weber signed a card on January 22, 1976. She read it before she signed it. Weber testified that Diamond, the union representative who handed it to her, said they needed a "two-thirds" signing of cards to come to a vote, and mentioned verification of the signatures. (She later said "majority.") He

also said that the purpose of the card was to authorize the union to represent her. (Weber so testified twice.) She also said that she "took it" that a card check was "mandatory." The Board did not err in finding that her card was valid. Weber's subjective impression that a card check was mandatory does not overcome what she read plus what she was told.

### (b) *Majo Michaels.*

Michaels signed her card on January 19. She read it before she signed it. On the same day, she signed the Union's letter to L'Eggs. That letter says in part:

> We are writing to advise you that a group of your employees are actively engaged in an organizing program to obtain a union contract. These employees are exercising their rights to form, join or assist a labor organization of their choice. These employees are as follows: (There are 13 signatures including that of Michaels.)

She testified that at a meeting the day before she signed the card, it was explained that the cards were "to be presented to the company to show the company that we wished to be represented by the Retail Clerks Union for collective bargaining. . . [I]f we got a majority, that we would have an election. . . . We had to have an election in order to get the union." This is not a statement that the card was to be used only or solely to get an election. The Board did not err in finding that the card was valid.

### (c) *Kathryn Nuro.*

One of the RSRs, Schmidt, invited Nuro to a January 21 meeting with union representatives. She signed the card at that meeting and she read it before she signed it. Schmidt told Nuro that the Union was seeking cards, "that cards are being signed to obtain a majority of signatures so that the union could negotiate for us." At the meeting, Nuro asked union representative

Diamond what signing the card would mean. He replied that the union would do one or two things with the card, that it would give her the right to vote and the opportunity to be exposed to more information concerning the union. She then asked "if this signing would commit me to anything, did it make me liable for anything"; Diamond replied no, it did not commit her to anything.

The AL Judge and Board interpreted "commit" to mean "oblige to join the union or pay union dues." This interpretation, true or not, was within the Board's expertise and discretion to make. Thus the Board did not err by holding that Nuro must be bound by the "clear language" of the card she signed, because that language was not "deliberately and clearly canceled" by a calculated misrepresentation. *Gissel Packing Co.*, 395 U.S. at 606, 89 S.Ct. at 1936.

This conclusion is reinforced by the fact that at the meeting Diamond told Nuro about the possibility of a card check. The standard is objective (what Nuro was told), not subjective (what Nuro understood). It does not matter that Nuro now claims that the statements made to her left her confused or with an erroneous impression. In any event, she testified that as a result of the statements made to her at the meeting she understood that the union could represent the RSRs without there first being an election (although, she added, she also understood "that there would be no commitment or no final decision at that point of signing the card"). Her card was properly upheld.

### (d) *Diane Getchel.*

Getchel signed a card on January 17, 1976, and she read it before she signed it. At that time, Getchel also signed the Union's January 19 letter to L'Eggs. Carol Washington, a pro union RSR, gave her the card and presented the letter to her in Santa Barbara. Getchel testified that just before she signed her card, she stated that

she read the card to mean that she authorized the Union to be her collective bargaining representative, and asked union adherents Washington and Rehmann what the card "really" meant. The response, Getchel testified, was that this was just to find out how many girls were interested in the Union.

Standing alone, this use of "interested" could mean that she was "curious about" the Union. But there is more: She testified that Washington and Rehmann told her that the first thing that had to be done was to get these signatures in to L'Eggs to let them know that we definitely were interested in the Union and that for that reason she signed the card. As the word "interested" is used in this testimony, it clearly means "supporting" rather than merely "curious."

If the only statement made to Getchel about the cards were that the card was just to find out how many girls were interested in the Union, this would be a misrepresentation which the Board might find sufficient to invalidate the card. We do not express an opinion on it, however, because the AL Judge discredited Getchel's testimony and chose instead to credit the testimony of Washington, who said that she correctly explained the role of cards to Getchel. The AL Judge's credibility determination was within his discretion, particularly in light of the Supreme Court's comment that employees subjected to § 8(a)(1) violations can be expected to give anti-union testimony. *NLRB v. Gissel Packing Co., supra*, 395 U.S. at 608, 89 S.Ct. at 1937.

### (e) *The revocations.*

Weber, Michaels, Nuro and Getchel, as well as some others RSRs, each sent the Union a revocation of the card she had signed. L'Eggs relies on these revocations as a ground for invalidating the cards of Nuro and Getchel. The Board refused to recognize any of the revocations, on the ground that all of them occurred after L'Eggs' program of unfair labor practices began. The record supports the Board.

We uphold the finding and conclusion of the Board that the union had a valid majority in the unit.

### C. *The order to bargain should be reconsidered.*

### 1. *The effect of the discharges.*

### (a) *Morgan.*

It would not be proper to rely on the unlawful discharge of Morgan as the basis for a bargaining order. The union organizing drive did not begin until weeks after her discharge, and all of the signed cards were obtained long after her discharge. *Arbie Mineral Feed Co. v. NLRB*, 8 Cir., 1971, 438 F.2d 940. *See also Cato Show Printing Co.*, 1975, 219 N.L.R.B. 739, 762.

### (b) *Wade.*

Because we hold that Wade was not discharged because of her union activities, her discharge cannot be relied upon to support the bargaining order. Thus this case is not like *NLRB v. Ultra-Sonic DeBurring, Inc.*, 9 Cir., 1979, 593 F.2d 123, but does, in this respect, resemble *Arbie Mineral Feed Co., supra*. It is true that the AL Judge said "I have found that Respondent's campaign against the Union included coercive interrogations of employees, threats of more onerous working conditions should the RSRs become unionized, encouragement of surveillance of RSRs' union activities, solicitations of revocations of authorization cards and support for the Union," but he immediately coupled this with the discharges of Wade and Morgan, and he then said: "At the very least, Wade's termination would support issuance of a remedial bargaining order, for the precipitous nature of that discharge must have brought it to the other RSRs' attention, thereby having a 'far-reaching effect, the meaning of which could not have been lost on them: support the Union and lose your job.'"

 Under these circumstances, the bargaining order should be reconsidered.

We decline to set the bargaining order aside finally, as L'Eggs urges us to do. Rather, we think it proper to remand to the Board for reconsideration of the bargaining order, as we did in *NLRB v. Randall P. Kane, Inc.,* 9 Cir., 1978, 581 F.2d 215, 220; *NLRB v. Four Winds Industries, Inc.,* 9 Cir., 1976, 530 F.2d 75, 80–81.

### 2. *The misconduct of the union.*

■ Jenni Pizzino, an RSR who had signed a union card, testified before the AL Judge on September 9, 1976. Her testimony was not favorable to the Union and when she left the hearing, she overheard union agent Rod Diamond say to union agent Lee that Pizzino had lied when she testified. She confronted the two agents and some words were exchanged.

Nothing more happened until October 19, when Pizzino was servicing two stores on her route in the town of Cudahy. When she entered the first store, Diamond was there, on other business. Upon seeing her, he used his union power to force the store manager to prevent Pizzino from carrying out her duties. L'Eggs argues that this retaliatory action destroys any entitlement to a bargaining order that the Union might otherwise have. We agree with the findings of the AL Judge:

> "I make the following findings: that the Union was upset with Pizzino's testimony on September 9; that the Union had never interfered with the RSRs' normal procedure of racking merchandise on the boutiques until October 19; that it did not interfere with racking by any RSR, including Pizzino, thereafter; that the Union had been aware, prior to October 19, of the procedure followed by the RSRs in racking merchandise on the boutiques; that Diamond did approach the two store managers and interfere with Pizzino's normal racking procedures on October 19; and, that Diamond's conduct that day had been motivated by his dissatisfaction with the testimony that Pizzino had given on September 9."

Nothing further was done by any union representative.

The confrontation in the stores occurred almost six weeks after Pizzino testified, after all RSRs called by either side had given their testimony in chief, and one day before L'Eggs called its last witness, not an RSR, and rested its case. Nothing in the record suggests that Diamond's misbehavior had any effect at all on the testimony of any witness at the hearing.

The AL Judge, although he strongly disapproved of Diamond's conduct, applied a balancing test, and concluded that the incident did not require denial of an otherwise proper bargaining order. We also strongly disapprove of Diamond's conduct but in light of the fact that the Union was unable to profit from its misconduct, we agree with the result reached by the AL Judge. *See NLRB v. Triumph Curing Center,* 9 Cir., 1978, 571 F.2d 462, 475–478. There, in the face of much more serious union misconduct, we upheld a bargaining order. *See also Great Chinese American Sewing Co. v. NLRB,* 9 Cir., 1978, 578 F.2d 251, 256; *Donovan v. NLRB,* 2 Cir., 1975, 520 F.2d 1316, 1320–1323.

## V. *The Application for Leave to Adduce Additional Evidence.*

### A. *The Nature of the Motion.*

L'Eggs has moved for leave to adduce additional evidence showing that circumstances have changed since the Board entered its order. It wishes to show that its parent company was acquired by another company on January 30, 1979, that the new parent now controls L'Eggs labor relations, that the new parent has a different and more pro-union labor policy than the old parent had, that of the 40 RSRs in the bargaining unit, only 27 were employed at the time of the hearing, only 8 were still employed when the Board decided the case, and only 5 are now employed, while, because of additional duties, there are now 66 RSRs, and that only one of the eight supervisory personnel employed in the Southern California district in January, 1976, is still employed there.

## B. *The Applicable Law.*

Section 10(e) of the Act, 29 U.S.C. § 160(e), provides in pertinent part:

If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings

. . . .

The Act does not provide for the taking of such evidence before this court. *See South Prairie Construction v. Operating Engineers*, 1976, 425 U.S. 800, 804–806, 96 S.Ct. 1842, 1844–1845, 48 L.Ed.2d 382; *NLRB v. Albert Van Luit and Co.*, 9 Cir., 1979, 597 F.2d 681; *Great Chinese American Sewing Co. v. NLRB, supra*, 578 F.2d at 255–256. If new evidence is to be received, it is the Board, not this court, that should receive it.

Since the decision in *Gissel Packing Co., supra*, the question of whether, and if so how, to consider subsequent events has remained unresolved. Early Supreme Court cases held that the Board could properly ignore subsequent events when deciding whether to issue a bargaining order. *See, e. g., NLRB v. Katz*, 1962, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230; *Franks Bros. Co. v. NLRB*, 1944, 321 U.S. 702, 703–706, 64 S.Ct. 817, 818–819, 88 L.Ed. 1020; *See also* Note, Bargaining Orders Since *Gissel Packing*: Time to Blow the Whistle on Gissel? 1972 Wisc.L.Rev. 1170, 1179.

The board has consistently refused to consider subsequent events in determining whether a bargaining order is appropriate, *see, e. g., Bandag, Inc.*, N.L.R.B., 1977, 228, N.L.R.B. 1045, 1045 n. 1; *Gibson Prod. Co.*, N.L.R.B., 1970, 185 N.L.R.B. 362, even where the law of the circuit was to the contrary, *see, e. g., Bandag, Inc. v. NLRB*, 5 Cir., 1978, 583 F.2d 765, 773–775 (Clark, J., concurring in part and dissenting in part).

The Courts of Appeals are not in agreement on the question of whether, and if so, when, changed circumstances must be considered. *See Hedstrom Co. v. NLRB*, 3 Cir., 1977, 558 F.2d 1137 (remand because, among other things, Board did not consider effect of passage of three years' time); *NLRB v. Ship Shape Maintenance Co.*, D.C. Cir., 1972, 474 F.2d 434, 443 (enforcement of bargaining order denied because of events occurring after proceedings before the Board); *NLRB v. American Cable Systems, Inc.*, 5 Cir., 1970, 427 F.2d 446 (Board must consider changed circumstances, after remand on independent ground); *NLRB v. Gibson Products Co.*, 5 Cir., 1974, 494 F.2d 762, 766 n. 4 (*American Cable Systems* rule inapplicable unless remand is necessary on independent ground).

## C. *The Law of this Circuit.*

*NLRB v. L. B. Foster Co.*, 9 Cir., 1969, 418 F.2d 1, is often cited as a case fully accepting the Board position on changed circumstances. In that case, we enforced the Board's bargaining order despite turnover so great that as of the date of enforcement it was "possible that, . . . there [was] not a single remaining employee who was concerned with the original election." *Id.* at 4. We found such an approach necessary because consideration of subsequent events at the enforcement stage would "put a premium upon continued litigation by the employer" who could hope that the resulting delay will produce a new set of facts, as to which the Board must then readjudicate." We asked, "[w]hen is the process to stop?" *Id.* This is also the rationale adopted by Mr. Justice Black, speaking for a unanimous Court (the Chief Justice not participating) in *Franks Bros. Co. v. NLRB, supra*, 321 U.S. at 705, 64 S.Ct. at 819. He also buttressed the Court's position by

pointing out that employees are not locked into union representation but can, after a reasonable time, vote the union out. *Id.*

Our cases following *Foster* admit to disenfranchising employees but adhere to the *Franks Bros.* rationale in order to maintain the appropriate deterrence of employers. *NLRB v. Pacific Southwest Airlines,* 9 Cir., 1977, 550 F.2d 1148, 1153.

There is language in some of our cases that suggests that the Board should consider subsequent events, up to the time of its decision. *See, e. g., NLRB v. Coca-Cola Bottling Co.,* 9 Cir., 1972, 472 F.2d 140, 141 ("The relevant period for determining the appropriateness of the bargaining order is as of when it was before the NLRB."). However, we find no cases in this circuit that remand to the Board because of a lack of evidence on the record of consideration of such events. In *Coca-Cola* we enforced the bargaining order while inviting, but expressly not requiring, the Board to consider events occurring after its initial proceedings because of the extreme turnover involved in that case, thought to be "unique."

In the case at bar, we adhere to the rationale of *Franks Bros., supra,* and *Foster Co., supra.* We will not remand to the Board and require it to consider events occurring after its decision, where we are upholding the Board's order in toto. There must be an end to litigation in Labor Board cases. The most that we will do is to allow or require the Board, in cases which we remand on an independent ground, to consider events occurring after its decision.

The present case differed from *Coca-Cola,* and from our other decisions. Here, we are finding that an important unfair labor practice charge, sustained by the Board, is not supported by the evidence. We are therefore remanding the case to the Board, to reconsider its bargaining order. This conclusively shows that the petition to our court was not brought frivolously and solely for the purpose of delay, to aggrandize the change in circumstances. There-

fore, when the petitioner obtains a remand on an independent ground, we consider it entirely appropriate to require the Board, in reconsidering the bargaining order, to consider the new evidence proffered in L'Eggs' motion. This is what was done in *American Cable Systems, Inc., supra,* 427 F.2d 446; *Hedstrom Co., supra,* 558 F.2d 1137. *And see Note,* "After all, Tomorrow is Another Day": Should Subsequent Events Affect the Validity of Bargaining Orders?, 31 Stan. L.Rev. 505, 521–525 (1979). In so doing, we are not departing from our rule in *Foster Co.* Here L'Eggs is a successful litigant, to the extent of convincing us that the bargaining order must be reconsidered. Consideration by the Board of its proffered evidence will assist, rather than hinder, the Board in its reconsideration of the order to bargain.

## VI. *Conclusion.*

The Board's finding and conclusion that the discharge of Jackie Wade Smith was an unfair labor practice, and the portion of its order requiring that she be reinstated with back pay, are each set aside.

The Board's order that L'Eggs Products, Inc., shall bargain with the Union is set aside, and the case is remanded to the Board for reconsideration of that order.

The Renewed Application for Leave to Adduce Additional Evidence is denied, insofar as it seeks to introduce such evidence before this court. The Application is referred to the Board with directions to receive the evidence.

In all other respects, the order of the Board is affirmed, and will be enforced upon presentation by the Board of an appropriate order.

PALMIERI, District Judge, concurs only in the result.