718 F.2d 892
 113 L.R.R.M. (BNA) 2570, 115 L.R.R.M. (BNA) 2543,
97 Lab.Cas. P 10,100, 99 Lab.Cas. P 10,617
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Automobile Salesman's Union, Local 1095, United Food and
Commercial Workers Union, AFL-CIO, Intervenor,
v.
ED CHANDLER FORD, INC., Respondent.
 No. 82-7351.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 14, 1983.
Decided May 10, 1983.
As Amended Oct. 26, 1983.
 
 Victoria Higman, N.L.R.B., Washington, D.C., for petitioner.
 Robert G. Hulteng and Littler, Mendelson, Fastiff & Tichy, David Rosenfeld, Van Bourg, Allen, Weinberg & Roger, San Francisco, Cal., for respondent.
 Application for Enforcement of an Order of the National Labor Relations Board.
 Before MERRILL, CHOY, and ALARCON, Circuit Judges.
 ALARCON, Circuit Judge:
 
 I.
 
 1
 In August, 1978, the Automobile Salesman's Union (hereinafter the "Union") commenced a campaign to organize the salespersons employed by Ed Chandler Ford, Inc. (hereinafter the "Company") at the Company's Hayward, California location. On August 11, 1978, the Company was requested to recognize the Union as the salespersons' exclusive bargaining representative. The Union claimed that it had obtained signed authorization cards from a majority of the Company's salespersons. The Company refused to recognize the Union. Accordingly, the Union filed a petition with the National Labor Relations Board (hereinafter the "Board"), on August 11, 1978, seeking a representation election. The election was conducted on September 26, 1978. The Union failed to receive a majority vote. The Union then filed objections concerning the conduct of the election with the Board. The Board found that the Company committed numerous unfair labor practices during the course of the election campaign. The Board held that the unfair practices were of such a serious nature as to foreclose the possibility of a fair second election. Based on this finding, and the Board's conclusion that 18 out of 35 employees in the salesperson bargaining unit had signed valid union authorization cards, the Board ordered the Company to recognize and bargain with the Union. The Union and the Board seek enforcement of the Board's bargaining order.
 
 
 2
 It is not necessary for this Court to reach the question of whether the alleged unfair labor practices justify the imposition of a bargaining order. We have concluded from our review of the evidence that only 17 out of the 35 salespersons authorized the Union to bargain for them. Thus, the Union did not have a valid card majority.
 
 II.
 
 3
 On August 11, 1978, salesperson Anthony Taylor gave salesperson Hank Medieros a union authorization card[1] and asked him to read it. Medieros took the card to his office in another building, filled it out and returned it to Taylor. Taylor made no statements to Medieros regarding the purpose of the card.
 
 
 4
 One month prior to signing the card Medieros saw Union Business Agent Ed Hill during his lunch hour. Hill told Medieros that the Union intended to circulate union authorization cards among the Company's employees. Hill asked Medieros to sign one of these cards when circulated. Medieros testified that Hill explained to him the only purpose of the card was to hold an election. This testimony was uncontradicted.
 
 
 5
 In NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (hereinafter Gissel ), the Supreme Court approved the Board's interpretation of the law concerning the validity of authorization cards as set forth in Cumberland Shoe Corporation, 144 N.L.R.B. 1268, and Levi Strauss & Co., 172 N.L.R.B. 732. The Court stated in Gissel that:
 
 
 6
 ... Under the Cumberland Shoe doctrine, if the card itself is unambiguous (i.e., states on its face that the card signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told the card was to be used solely for the purposes of obtaining an election.... (Gissel, 395 U.S. at 584, 89 S.Ct. at 1924).
 
 
 7
 The Court also quoted with approval the Board's language in Levi Strauss & Co., supra, which provides that:
 
 
 8
 it is not the use or nonuse of certain key or "magic" words that is controlling, but whether or not the totality of circumstances surrounding the card solicitation is such as to add up to an assurance to the card signer that his card will be used for no purpose other than to help get an election. (Gissel, 395 U.S. at 608 n. 27, 89 S.Ct. at 1937 n. 27).
 
 
 9
 In the matter before us the Board adopted the Administrative Law Judge's finding that Hill represented to Medieros that the sole purpose of the card was for an election.
 
 
 10
 The Board concluded, however, that this representation was too remote, because: (a) Medieros signed the card one month after talking to Hill, (b) Taylor, not Hill, obtained Medieros' signature, and (c) Taylor made no representations as to the purpose of the card.
 
 
 11
 The Board held that Hill's representation was not a part of the "totality of circumstances surrounding the solicitation of the card." We disagree.
 
 
 12
 Generally, evidence is remote only when there is no visible, plain, or necessary connection between it and the proposition eventually to be proved. Black's Law Dictionary, 5th Ed. p. 1164 "Remoteness of evidence."
 
 
 13
 Hill was a paid Union official at the time he spoke with Medieros concerning the purpose of the card. Medieros testified that he had Hill's statements in his mind when he signed the card. Further, Medieros stated that he did not read the card because he was relying on what Hill had represented to him.
 
 
 14
 We find a plain, visible and necessary connection between Hill's representation to Medieros and the purpose for which the card was signed.
 
 
 15
 We find no evidence in the record to support the Board's conclusion that Medieros did not rely on Hill's representation at the time he signed the card.
 
 
 16
 We therefore conclude that Hill's representation is part of the "totality of circumstances surrounding the solicitation." (Gissel, 375 U.S. at 608, n. 27, 89 S.Ct. at 1937, n. 27). Accordingly, we find that Medieros signed the card believing that the sole purpose was to authorize an election.
 
 III.
 
 17
 Our decision to invalidate the Medieros card is not contrary to established case law which precludes consideration of subjective testimony.
 
 
 18
 We held in L'Eggs Products, Inc. v. N.L.R.B., 619 F.2d 1337, 1349 (9th Cir.1980) that an otherwise unambiguous card would not be invalidated if the only evidence presented was subjective. Subjective evidence consists of what the signer understood. Objective evidence consists of what the signer was told. Id. at 1349.
 
 
 19
 Hill's representation to Medieros, that the sole purpose of the card was for an election, is objective evidence which invalidates the card signed in reliance thereon.
 
 
 20
 Enforcement of the bargaining order is denied because the Union never obtained majority status.
 
 IV.
 
 21
 The Company did not contest the Board's findings of violations of Sec. 8(a)(1) of the National Labor Relations Act (29 U.S.C. Sec. 158(a)(1).[2] The issue before this court was whether those violations were serious enough to warrant the bargaining order remedy. Therefore, that part of the Board's order, which relates to the findings of unfair labor practices, is entitled to enforcement. NLRB v. Nevis, 647 F.2d 905, 908 (9th Cir.1981) (failure to contest the Board's holding constitutes a waiver) (citing Riverside Press, Inc. v. NLRB, 415 F.2d 281, 284-85 (5th Cir.1969), cert. denied, 397 U.S. 912, 90 S.Ct. 915, 25 L.Ed.2d 94 (1970).
 
 
 22
 Enforcement of that part of the Board's order concerning the uncontested violations is GRANTED. Enforcement of the bargaining order is DENIED.
 
 
 
 [1]
 The Board adopted the Administrative Law Judge's finding that the union authorization card given to Medieros contained clear and unequivocal language
 
 
 [2]
 The Board found the following violations: (1) the threat that union activities are inconsistent with continued employment, (2) a rule that prohibited discussion of the union during nonworking time in nonpublic areas, (3) the deliberate inclusion of an ineligible voter in the voter eligibility list submitted to the Board, and (4) the threat of cancellation of bonuses if employees supported the union