## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## RANDALL P. KANE, INC., d/b/a The Catalyst, Respondent.

### No. 77–3288.

United States Court of Appeals, Ninth Circuit.

Aug. 28, 1978.

Wilfred F. Sykora, N. L. R. B. (argued), Washington, D. C., for petitioner.

Michael J. Hogan (argued), of Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for respondent.

Before KILKENNY, TRASK and SNEED, Circuit Judges.

KILKENNY, Circuit Judge:

This case is before us on an application of the National Labor Relations Board [Board] under § 10(e) of the National Labor Relations Act [Act], 29 U.S.C. § 160(e) for enforcement of its bargaining and related orders against employer Randall P. Kane, Inc., the respondent. It operates "The Catalyst", a restaurant-bar-music hall in Santa Cruz, California.

Respondent was charged with fourteen violations of §§ 8(a)(1), (3) and (5) of the Act, 29 U.S.C. § 151 et seq. Subsequent to a hearing held in January, 1977, the Administrative Law Judge [ALJ] found that respondent had, in nine instances, violated the provisions of the Act, as charged. His decision was affirmed by the Board in June, 1977.

## FACTS

On April 1, 1976, two representatives of the Hotel, Motel, Restaurant Employees and Bartenders International Union, Local No. 483 [the Union] met with four of respondent's employees: Rice, Puhl, Ryerson and Petrovitch. Rice, Puhl and Ryerson were given union authorization cards and instructed to seek signatures among employees at "The Catalyst."

During the first week of the card signing campaign respondent's general manager, McShan, told Ryerson that Puhl had been trying to "organize the busboys." Later that week McShan and Puhl argued, and McShan accused Puhl of "unionizing" the employees. He also said that respondent would, "fire all the busboys and hire Mexicans and Filipinos . . . for $1.30 an hour [to] do twice the work." Also early in

the signature drive McShan asked employee Samuels if he had signed a union authorization card. Samuels refused to answer. It is unclear from the record where this exchange took place.

The card solicitation campaign went on for approximately two weeks, and 51 signed cards out of 86 potential signators were returned to Union officials. On April 2, 1976, only one day after the signature solicitation drive began, Rice drafted an amendment to the cards which read:

"Once signed, this card gives the AFL–CIO permission to represent you as an unorganized worker, before the National Labor Relations Board. This does not mean that you are or have joined a union. This is only the first step towards free and open discussion with regard to collective bargaining between Catalyst workers and the management."

Rice, Puhl and Ryerson all testified that when explaining the purpose of the cards to potential signers they informed them that the cards were just an initial step in approving a union and would result in a union election. Five signers testified before the ALJ that they were told by the union solicitors that their signatures would allow the employees to conduct an election to determine if they really wanted a union or not. The ALJ held that only one of those five employees had been told that her signature was "solely" for the purpose of having an election, and thus the card was ineligible in computing whether the Union received a valid card majority. Eleven other employees stipulated that they would testify in substantially the same fashion as the five employees who took the stand.

On April 14, 1976, after the card solicitation had ended, Rice and Puhl had a heated exchange with Kane, owner of respondent. Kane told them to "get the hell out" and to go find a job. Later that day Rice and Puhl were informed that Kane had not meant to fire them. Puhl returned to the job, but Rice refused to work unless he received union representation and benefits. On April 23, 1976, McShan met with Rice in an attempt to reconcile the differences that

had erupted on the night of the 14th between Kane and Rice. Rice demanded that his salary be increased and that a new job description be created for him. McShan replied that if the employees would stop their efforts to secure a union that everything would be alright.

On April 15, 1976, in response to questions by three employees McShan said that there would be tough new rules and regulations at "The Catalyst" if a union were voted in and that the employees might lose some benefits as well.

The Union issued its demand for recognition in an April 19th letter to respondent. The letter claimed that the Union had a card majority and requested a meeting to begin contract negotiations.

One other employee of "The Catalyst", Widin, was involved in a series of acts which were deemed by the ALJ to be violations of the Act.[1] Widin asked several employees if they planned to attend a union organizational meeting. Widin met with Ryerson in a local tavern on April 30th and told him that respondent could make working conditions far more oppressive for the employees if the Union were approved. He also told Ryerson that the employees would "get less money." Employee Montoya had three conversations with Widin during May of 1976. On each occasion Widin warned Montoya that working conditions would be stricter and wages lower if respondent was forced to bargain collectively. The final alleged violation occurred on May 5, 1976, when Widin and Puhl clashed over Widin's firing of two "Catalyst" employees. Later that evening, after Widin had reported the incident to Kane, Kane told Puhl that they should "sever" their relationship. Kane said he was "tired of [Puhl's] interfering with the day-to-day operation of the place . . . ." Puhl called Kane the next day and asked for a complete explanation of his discharge. Kane told him that he could not stand being "vilified."

## DISCUSSION

■ The general standard of review of Board decisions is clear. If the Board's decision rests on findings of fact for which there is substantial evidence in the record, we must affirm. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Broadmoor Lumber Co.,* 578 F.2d 238 at 240 (9 Cir. 1978).

### 1. *Section 8(a)(1) violations.*

■ Threats, intimidation, interrogation, and surveillance of union sympathizers demonstrate the clearest form of conduct in violation of § 8(a)(1). *Free-Flow Packaging Corp. v. NLRB,* 566 F.2d 1124, 1131 (CA9 1978); *NLRB v. Squire Shops, Inc.,* 559 F.2d 486, 487 (CA9 1977). Here there is substantial evidence that Kane and his supervisors, McShan and Widin, repeatedly violated § 8(a)(1) both during and after the Union card solicitation campaign. McShan questioned both Puhl and Ryerson during the first week of authorization card collection and threatened to hire alien labor if the Union was successful. McShan also told three employees that working conditions and benefits would be changed to the detriment of the employees if the Union was victorious. Widin asked a number of "The Catalyst" employees if they planned to attend a Union organizational meeting. He also informed Ryerson and Montoya that employee acceptance of the Union would mean significantly harsher working conditions and lower overall compensation. Of course, to some degree, the ALJ's findings were based on his assessment of the credibility of various witnesses. The ALJ was in the position to be able to observe the witnesses' demeanor and conduct on the stand, and thus, we may only reverse his credibility findings if a clear preponderance of the evidence shows that he was wrong. *NLRB v. Broadmoor Lumber Co., supra,* at

1. Respondent argues that Widin was not a supervisor under the Act. We note that he did have broad personnel authority at "The Catalyst" including the right to hire and fire. More-

over, we must also give deference to the Board's determination that Widin was a supervisor. *Kaiser Engineers v. NLRB,* 538 F.2d 1379, 1383–84 (CA9 1976).

241; *NLRB v. Western Clinical Laboratory, Inc.*, 571 F.2d 457, 459 (CA9 1978). We believe that the record supports the ALJ's findings here.

### 2. *Section 8(a)(3) violations.*

In its complaint the Board charged that both Rice and Puhl had been discharged because of their union activity. The ALJ concluded that Kane had not fired the two men on April 14th, and the Board affirmed. The issue is not before us. However, the May 5, 1976, firing of Puhl merits our consideration.

■ The ALJ found and the Board affirmed that Puhl had been fired in violation of § 8(a)(3). We must determine whether "the business reason or the protected union activity is the moving cause behind the discharge." *NLRB v. Ayer Lar Sanitarium,* 436 F.2d 45, 50 (CA9 1970). From our review of the circumstances surrounding the firing there was indeed substantial evidence for the Board to find that the firing was motivated by Puhl's union efforts, and thus respondent did violate § 8(a)(3). *Great Chinese Am. Sewing Co. v. NLRB,* 578 F.2d 251 at 254 (9 Cir. 1978).

### 3. *Section 8(a)(5) violations.*

On April 19, 1976, the Union made its demand for recognition and negotiations. It contended that 51 of the 86 eligible employees at "The Catalyst" had signed union authorization cards, and that this card majority made the Union the exclusive bargaining agent for the workers. Respondent refused to bargain collectively and challenged the card majority.

Respondent contends that card signatures were induced solely by the representation that the cards were merely for purposes of obtaining a union election. We agree that a more detailed examination should be held to determine the circumstances surrounding 15 [2] of the signatures.

■ The validity of union authorization cards in calculating a card majority is determined by the rule announced in *Cumberland Shoe Corp.,* 144 NLRB 1268 (1963), enf'd. 351 F.2d 917 (CA6 1965). The Supreme Court adopted the *Cumberland Shoe* doctrine in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 584, 85 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The rule states that an authorization card counts toward the 50% majority unless the employer can demonstrate that the solicitors told the employees that the sole purpose of the card was to obtain a union election.

Our court has faced similar questions regarding authorization cards. In *NLRB v. South Bay Daily Breeze,* 415 F.2d 360, 365–67 (CA9 1969), *cert. denied* 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970), the court examined Cumberland Shoe's applicability in two instances: the first card signer was told that his card was to be used only for purposes of securing a union election—the card was rejected by the court; the second signer was not told that the card would be used only to achieve an election, however, he did testify that his sole intent in signing the card was to bring about an election—the card was counted by the court toward a union majority.

■ We believe that the facts surrounding those 15 employees who either testified or stipulated their testimony before the ALJ are arguably like those presented by the signer whose card was rejected in *South Bay Daily Breeze.* Here, as there, the evidence shows that the prospective signers were told that the cards would result in an election. Their intent was not at issue. The degree to which those signing the cards were influenced by

---

2. The fifteen employees include the eleven whose testimony was submitted to the ALJ on the basis previously stated, and the four employees who testified but whose cards were counted toward the union majority. Eleven employees stipulated that they would testify in the same way as the five who took the stand and answered questions about what the union organizers told them before they signed the authorization cards. The General Counsel's suggestion that the eleven cards be judged in proportion to the five cards is rendered meaningless because we hold that all cards of those testifying which were counted toward a union majority must be reexamined.

this election argument is for the Board to consider; however, we caution the Board that they should not engage in a "mechanical application" of *Cumberland Shoe. NLRB v. Gissel Packing Co., supra,* 395 U.S. at 608, 85 S.Ct. 1918. It is the totality of circumstances surrounding the card solicitation rather than the use of specific words that determines if a union agent effectively negated the card's language through his solicitation.[3]

### 4. *Bargaining Order.*

■ In light of our decision that the Board must receive evidence on signing of the challenged cards, and again examine the issue on the union card majority, we decline to approve a bargaining order. Respondent's unfair labor practices do not rise to the level of "outrageous" and "pervasive" such as to allow issuance of a bargaining order when there is no union majority. *NLRB v. Gissel Packing Co., supra,* at 613–14, 85 S.Ct. 1918.

### 5. *Other Contentions.*

■ After a thorough analysis of the issue involving the quashing of the subpoena served on the Board employee O'Neill, we conclude that the ALJ erred in this action without first seeking the independent evaluation of the general counsel. However, no prejudicial harm resulted.

### CONCLUSION

The petition of the NLRB seeking enforcement of its order is granted with respect to violations of §§ 8(a)(1) and (3) of the Act. That portion of the petition seeking enforcement of alleged § 8(a)(5) violations is denied and the cause remanded to the Board with instructions to receive evidence and make findings consistent with this opinion.

The Board must reconsider its bargaining order in the light of its findings on whether the Union obtained a card majority.

**3.** The Board may also wish to consider the effect of Rice's appendix to the authorization cards.