**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ADAMS DELIVERY SERVICE, INC., Respondent.**

**No. 79–7050.**

United States Court of Appeals, Ninth Circuit.

July 10, 1980.

Howard E. Perlstein, Washington, D. C., for petitioner.

Alan S. Levins, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., argued, Paula Gold, San Francisco, Cal., on brief, for respondent.

Before ANDERSON, SCHROEDER and FARRIS, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

The N.L.R.B. petitions for enforcement of its order requiring respondent Adams Delivery Service, Inc., to reinstate employee Dennis Wilson with back pay and no loss of seniority rights. We grant the Board's petition to enforce. The Board's order is reported at 237 N.L.R.B. No. 140.

## I. BACKGROUND

Adams Delivery Service, Inc. (hereafter "Adams") is a California trucking firm which provides local delivery service for pharmaceutical products at three locations. At the time this case came before the Board, Adams employed approximately 25 drivers at its Oakland terminal, three drivers at Sacramento, and nine in the Los Angeles area. The present case arises out of an incident which occurred at the Sacramento facility.

The Board alleges that Adams committed an unfair labor practice when it discharged Sacramento driver Dennis Wilson on March 1, 1977, following Wilson's consultation with a union business representative regarding an overtime pay dispute. The circumstances of this case require that we develop Wilson's employment background with Adams in some detail.

Wilson came to work for Adams as a delivery truck driver on January 3, 1977. Wilson had previously worked in a similar capacity for West-Pac, another Sacramento trucking firm. Under the collective bargaining agreement then in force between Adams and Local No. 588 of the Retail Delivery Drivers, Driver Salesmen, Produce Workers & Helpers of Alameda County, California, a Teamsters Union affiliate, Adams was required to pay time and a half for all hours worked in excess of an eight-hour day. When Wilson received his first pay check on January 14, however, he noticed that he had not been paid for claimed overtime hours. Wilson spoke with his immediate supervisor, Lewis Solitske, about the overtime compensation, and was told that Adams did not pay for overtime work.

Wilson continued to claim overtime hours on his time card, even after his initial conversation with Solitske. He also continued to press his claims verbally with Solitske. According to Wilson's testimony before the Administrative Law Judge (ALJ), Solitske approached him on Friday, February 25, and told him that he had received a telephone call from Adams vice-president Randolph Marnell, who had informed Solitske that Wilson should cease reporting more than 40 hours a week or the company would fire him. Solitske testified that he had not made a threat to fire Wilson, but had merely told him to stop claiming overtime or he could "go back to West-Pac." Even though the ALJ credited Solitske's version of the conversation, he nevertheless found that it properly could be construed as a "threat" to Wilson.

The overtime problem was not the only source of irritation between Wilson and his superiors during his tenure with Adams, however. Adams had received complaints from a Payless Drug Store in Sacramento regarding Wilson's behavior during attempted deliveries. A few weeks after his initial hire date, Wilson became involved in a profane shouting match with the Payless warehouse manager when the manager refused to allow Wilson to make a delivery after the posted loading dock closing time. The manager called Adams president Frank Blichfeldt, but declined to submit a complaint in writing. A second incident sometime in late February prompted a second phone call from the Payless manager in which he told Randolph Marnell that he did

not want Wilson back. The manager reluctantly agreed to submit a complaint in writing this time.

Adams apparently had also discovered some alleged misrepresentations by Wilson regarding his driving record. A check with the Department of Motor Vehicles by Adams' liability insurance broker had revealed three moving violations and an accident within a thirty-seven month period. Though Adams claimed that it had been motivated in part by Wilson's poor driving record in discharging him on March 1, the ALJ chose to give this explanation little weight, mainly because the letter advising Adams of the violations was dated March 10.

The overtime controversy reached its climax on Monday, February 28. Wilson and Solitske apparently had another conversation that morning which, according to Wilson, contained yet another threat of termination unless Wilson stopped making overtime claims. Wilson replied that he would consult with the union's business representative. Late that afternoon, Wilson went to Local 588's union hall and met with business representative Frank Lomascola. After conferring with Wilson for a few minutes, Lomascola telephoned Randolph Marnell and spoke with him about the overtime problem. Lomascola informed Marnell that Wilson was in his office and had not been paid overtime as required by the collective bargaining agreement. According to Lomascola's testimony, Marnell replied, "Well, hell, if that's the case, we'll just fire him." Marnell testified that he did not threaten to fire Wilson during that conversation, describing Lomascola's version as a "direct lie." The ALJ did not credit Lomascola's account of the conversation completely, but did find that the conversation indicated sufficiently that Wilson was discharged mainly because of the overtime controversy.

The next morning when Wilson arrived for work, he was told by Solitske that he was being terminated because Marnell felt that he "was going to be a problem." In response to a subsequent union grievance, Marnell replied that Wilson had been terminated while still within his 90-day probationary period because of his "poor working attitude" and his "ill-tempered" reactions. Marnell's letter also cited Wilson's driving record and the insurance problems that it would create for Adams.

After a hearing on the matter, the ALJ found that, while Adams might have been justified in discharging Wilson because of the Payless Drug incidents, Wilson would not have been terminated "but for" his pressing of the overtime issue with the union. In his conclusions of law, the ALJ found that Solitske's comments on February 25 "interfered with, restrained and coerced" Adams' employees in violation of Section 8(a)(1) of the National Labor Relations Act, and that the act of discharging Wilson discriminated against him with respect to his hire and tenure of employment, and further interfered with, restrained, and coerced Adams' employees with respect to the exercise of statutorily guaranteed rights in violation of Section 8(a)(3) and (1). The ALJ ordered Adams *inter alia* to reinstate Wilson to his former position without prejudice to seniority rights, and to make him whole for any losses of pay. The Board adopted the ALJ's findings and order and now petitions this court for enforcement.

## II. *ISSUES*

In considering the enforceability of the Board's order in this case, we must confront two issues:

(1) Whether the Board's findings are supported by "substantial evidence";

(2) Whether Adams' act of discharging Wilson constituted an unfair labor practice.

## III. *DISCUSSION*

### A. *Substantial evidence standard*

█ Under the standard of review so often reiterated by this and other federal courts, we enforce the Board's order if its findings are supported by substantial evidence on the record as a whole, and if the Board applied the law correctly. *E. g., Butler-Johnson Corp. v. N.L.R.B.*, 608 F.2d

1303, 1305 (9th Cir. 1979). In reviewing the propriety of an employee discharge as an alleged violation of Section 8(a)(3), we inquire whether anti-union animus was the moving cause for the discharge; in essence whether the anti-union animus was the "but for" cause of the discharge. *Stephenson v. N.L.R.B.*, 614 F.2d 1210 (9th Cir. 1980). The Board has the burden of proving that a discharge was motivated by anti-union animus. *L'Eggs Products, Inc. v. N.L.R.B.*, 619 F.2d 1337, 1341 (9th Cir. 1980).

■ In reviewing the record, we leave matters of credibility to the trier of fact. We will affirm the trier of fact even though we might have drawn different conclusions if presented with the evidence *de novo*. Upon careful review of the record in this case, we find that the findings of the Board were supported by substantial evidence.

The company assails the Board's findings as consisting of impermissible inferences drawn from inconclusive evidence. We agree that the largely conflicting evidence in this case presents close questions of interpretation; we disagree, however, with the company's assertion that the inferences which the trier of fact chose to draw were improper under our standard of review. There was evidence in the record that the overtime problem had been a source of irritation between Wilson and his superiors almost from the time that Wilson arrived at Adams. There was evidence that Wilson's insistence upon claiming overtime compensation had caused concern among Adams' upper echelon to the point where his immediate supervisor was given instructions to tell Wilson to cease claiming it. The trier of fact found that this message delivered on February 25 came in the form of a "threat," an assessment which we cannot second-guess. It is also clear from the evidence that some mention of Wilson's possible discharge was made during Randolph Marnell's telephone conversation with Frank Lomascola. The most telling piece of evidence, however, is the timing of the discharge. Wilson complained to Lomascola late in the afternoon of February 28, and was terminated first thing the next morning. The inference of a cause-and-effect relationship between the two incidents is a strong one.

We also leave undisturbed the Board's finding that whatever other legitimate business reasons Adams might have had for terminating Wilson, his discharge was "triggered" by the Lomascola phone call and that Wilson's complaint to the union was the "but for" cause of his discharge. The Board found that the final telephone complaint from Payless Drug Stores was received before February 28. The Board also found that Marnell had acted to discharge Wilson without receiving Payless' complaint in writing, even though a letter of complaint had been requested and was eventually received from Payless. The Board was also unimpressed with the proffered justification of Wilson's bad driving record because official notification of his record was sent by Adams' insurance broker on March 10. Finally, the Board noted the failure on the part of Adams' management to articulate a reason for Wilson's discharge until several weeks after it occurred. Specifically, the Board found that even though Wilson's overtime complaint was not the sole reason for his discharge, he would not have been "forthwith" dismissed were it not for Marnell's negative reaction when presented with Lomascola's inquiry into the overtime situation. We find this inference to have been properly drawn and to have been supported by substantial evidence taken from the record as a whole.

All in all, the conclusion of the Board that Wilson would not have been discharged but for his act of taking the overtime complaint to the union is one which is justified by the record when evaluated within the constraints of our standard of review. The issue remains whether the act of discharging Wilson constituted an unfair labor practice cognizable under the National Labor Relations Act.

### B.   *Unfair labor practice*

■ The company argues that Wilson's discharge was not an unfair labor practice

under the so-called "fiction" announced by *N.L.R.B. v. Interboro Contractors, Inc.*, 388 F.2d 495 (2d Cir. 1967). Briefly stated, the *Interboro* fiction holds that the complaint of a single employee will be deemed "concerted [activity] for the purpose of collective bargaining or other mutual aid or protection" protected by Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, if motivated by the intent to enforce a provision of the collective bargaining agreement. The *Interboro* doctrine has been adopted "in principle" by this court. *See N.L.R.B. v. C & I Air Conditioning, Inc.*, 486 F.2d 977 (9th Cir. 1973); *see also N.L.R.B. v. Bighorn Beverage*, 614 F.2d 1238 (9th Cir. 1980). Adams contends that there is no evidence in the record indicating that Wilson knew that his overtime rights were guaranteed by the collective bargaining agreement. Absent such proof, this court could not find that he was engaged in "concerted activity" under *C & I Air Conditioning, supra.*

■ We decline, however, to apply the *Interboro* doctrine to the facts of this case. The Board found that Wilson's discharge was precipitated by his appeal to the union to look into the overtime problem. Union participation in the complaint process distinguishes this case from the line of decisions which have applied the *Interboro* fiction.[1] *See N.L.R.B. v. C & I Air Conditioning, supra; N.L.R.B. v. Ben Pekin Corporation*, 452 F.2d 205 (7th Cir. 1971); *cf. Pacific Electricord Company v. N.L.R.B.*, 361 F.2d 310 (9th Cir. 1980). Where an employee enlists the aid of the union to enforce a contractually-guaranteed employment right, the need to employ a fiction of group activity vanishes. Consultation with a union representative which has the object of resolving an employment dispute is clearly something more than mere griping. The employee's right to consult with his or her union regarding working conditions and to pursue established grievance procedures is one which is protected against employer interference by Sections 8(a)(1) and 8(a)(3) of the N.L.R.A. *See N.L.R.B. v. Lantz*, 607 F.2d 290, 298 (9th Cir. 1979); *N.L.R.B. v. R. W. Little, Inc.*, 493 F.2d 1245 (9th Cir. 1974); *Inter-Polymer Industries, Inc. v. N.L.R.B.*, 480 F.2d 631, 633 (9th Cir. 1973); *N.L.R.B. v. Victor Otlans Roofing Co.*, 445 F.2d 299, 300 (9th Cir. 1971); *N.L.R.B. v. Tom Johnson, Inc.*, 378 F.2d 342 (9th Cir. 1967); *Shattuck Denn Mining Corp. v. N.L.R.B.*, 362 F.2d 466, 470 (9th Cir. 1966). An employee need not know with certainty that a suspected grievance is founded upon a provision of the collective bargaining agreement. Our decisions indicate a strong preference that the established grievance procedure be used to resolve employment disputes, and to hold otherwise would ignore the importance of the counseling function which the union serves in these matters. Consequently, the lack of a finding below on Wilson's understanding of the collective bargaining agreement is unimportant.

## IV. CONCLUSION

Substantial evidence taken from the record as a whole supports the Board's finding that Wilson would not have been discharged but for pursuing the overtime compensation issue with his union business representative. Such an activity is one which is protected from employer interference by Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act. 29 U.S.C. § 158(a)(1) and (a)(3). Accordingly, we hold that the order of the National Labor Relations Board in this case shall be enforced.

IT IS SO ORDERED.

---

1. We are aware that some union participation in the complaint process took place in *Interboro* itself. In *Interboro*, however, the necessary group activity was established in the record, and the "*Interboro* doctrine" was announced as *dicta*. *See* 388 F.2d at 500.