# NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

# ANCHORAGE TIMES PUBLISHING CO., Respondent.

### No. 79–7024.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 8, 1980.

Decided Feb. 27, 1981.

Rehearing Denied April 29, 1981.

Douglas A. Riggs, Anchorage, Alaska, argued, for respondent; Karl Johnstone, Anchorage, Alaska, on brief.

Before ANDERSON and SKOPIL, Circuit Judges, and BYRNE,* District Judge.

WM. MATTHEW BYRNE, Jr., District Judge:

The National Labor Relations Board ("the Board") petitions for enforcement of its order against the Anchorage Times Publishing Co. ("the Company" or "the Times"), reported at 237 N.L.R.B. No. 78 (1978). We hold that substantial evidence supports all of the Board's unfair labor practice findings and, accordingly, enforce the Board's chosen remedies, including a bargaining order.

I. BACKGROUND

The Times is Alaska's largest newspaper publishing company, with its primary offices located in a single building in downtown Anchorage. During the relevant period, the Times employed approximately 280 employees in five departments.

During the late summer of 1976, several employees in the editorial department (the newsroom) initiated meetings between high level management officials and newsroom employees to discuss wages and working conditions.[1] Dissatisfied with the results of these meetings, a group of employees sought to find a union willing to represent the Times employees in the accounting, advertising, circulation, and editorial departments. To this end they met with William Coleman, a representative of the International Brotherhood of Electrical Workers, Local 1547 AFL–CIO ("the Union"), who agreed to help organize a campaign among Times employees in the four departments.

Coleman conducted four meetings with the employees between October 24 and No-

Ruah Donnelly Lahey, Washington, D. C., argued, for petitioner; Elliott Moore, NLRB, Washington, D. C., on brief.

* The Honorable Wm. Matthew Byrne, Jr., United States District Judge for the Central District of California, sitting by designation.

1. The first meeting was held in early August 1976, the second on September 22, and the third in early October. At these meetings topics included the phasing out of pressroom jobs because of the installation of new electronic equipment, inadequacies of salaries, and the existence of newly-established wage scales and promotion guidelines.

vember 5, 1976. At these meetings he solicited employees to sign cards authorizing the Union to represent them for the purpose of collective bargaining with Times management.[2] Coleman explained to the employees that if thirty percent of the employees in the bargaining unit signed such cards, a petition could be filed for a Board-conducted election. He further explained that if fifty-one percent of the employees in the bargaining unit signed authorization cards, the Union could request the Company to recognize the Union voluntarily as the employees' exclusive bargaining representative, although he cautioned that it was unlikely that the Company would extend such recognition. The employees were advised by Coleman that by signing the cards they were authorizing the Union to represent them in collective bargaining. Some of the cards were signed by employees at the meetings; others were signed at other locations and returned to the Union.

On November 15, 1976, the Union filed with the Board a petition requesting a representation election. After a hearing, the Regional Director determined that the appropriate bargaining unit contained 181 employees and that 97 valid authorization cards had been signed on or before November 13, 1976.[3] He ordered the election to be held in early January, 1977.

The election was held on January 20, 1977, and the employees voted seventy-seven to seventy-three against the Union, with sixteen ballots challenged.[4] The Union filed separate unfair labor practice charges against the Company on January 17, 1977, and on January 24, 1977. The Union contended that, during the course of the campaign, both before and after the Union filed the petition requesting an election, the Company engaged in a course of conduct that included interrogating employes about union sympathies; conducting surveillance of Union-related employee activities; threatening job losses in the event of a vote in favor of the Union; terminating an employee for discriminatory reasons; and granting wage increases immediately prior to the election in order to influence the employees' votes. These charges were consolidated for hearing before the Board's Administrative Law Judge ("ALJ"). After extensive hearings, he determined that the Company had violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 158(a)(1) & 158(a)(3) (1976). The ALJ found that the Union represented a majority of the employees and that the unfair labor practices prevented the holding of a fair "rerun" election. He therefore recommended that the Board set aside the results of the January 20 election and order the Company to bargain with the Union. The ALJ also recommended that one employee, who had been dismissed in violation of the Act, be reinstated and made whole, and that the customary notices be posted. The Board adopted the ALJ's recommendations with minor variations, not here relevant.[5] Now

2. The Union distributed two different cards to employees. The card handed out at meetings read:
   "AUTHORIZATION FOR REPRESENTATION
   I authorize the International Brotherhood of Electrical Workers to represent me in collective bargaining with my employer."
   The other card, which was mailed to employees, read:
   "I REQUEST A GOVERNMENT ELECTION
   I, the undersigned of my own free will, hereby authorize and designate the National Brotherhood of Electrical Workers of the AFL–CIO and CLC to represent me in collective bargaining with my employer in all matters pertaining to rates of pay, hours of employment, and other conditions of employ-

ment. This card is also for the purpose of requesting the N.L.R.B. for an election."

3. Three additional valid authorization cards were signed by employees on November 14, 1976, making a total of one hundred.

4. The Regional Director of the National Labor Relations Board issued a supplemental decision on the challenged ballots, overruling twelve challenges, sustaining one and leaving three undetermined. The revised tally showed a vote of eighty-eight to seventy-four against the Union.

5. The Board corrected certain computational errors made by the ALJ in determining total valid authorization cards and determined that the obligation to bargain arose on November 13, 1976. (Chairman Fanning disagreed on the issue as to when the duty to bargain arose.)

the Board petitions for enforcement of its order.

## II. *THE UNFAIR LABOR PRACTICES*

■ The Board found that the Company had engaged in a pervasive scheme of unfair labor practices, both before and after the filing of the election petition. In reviewing these findings, the Court cannot overturn decisions that are supported by substantial evidence in the record considered as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 464–65; 95 L.Ed. 456 (1951); *L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337, 1341 (9th Cir. 1980); *NLRB v. Tischler*, 615 F.2d 509, 511 (9th Cir. 1980); *NLRB v. Bighorn Beverage*, 614 F.2d 1238, 1240 (9th Cir. 1980). That is, if there are conflicting interpretations of the facts, and the one adopted by the Board is supported by substantial evidence, the Court may not substitute a different interpretation. *See*

*NLRB v. Adams Delivery Service, Inc.*, 623 F.2d 96, 99 (9th Cir. 1980).

### A. *INTERROGATIONS*

The largest number of unfair labor practice incidents found by the Board consisted of unlawful interrogations of employees about their union sympathies. These interrogations were conducted over a period of several months by various high-ranking Company officials including General Manager William Tobin (who oversaw all five departments), Managing Editor Clint Andrews (who supervised the editorial department), City Editor Michael Todd, and Director of Circulation Jules Molenda.[6]

■ The Company raises three objections to the Board's findings that these interrogations constituted unfair labor practices: first, that substantial evidence does not support the factual findings of the Board; second, that the Board erred in finding the interrogations unlawful because there was no evidence that the questioning actually

6. In early October 1976, reporter Mary Kay Brown approached General Manager Tobin regarding management's failure to reveal wage scales assigned to employee job levels. Tobin asked Brown what kind of conspiracy the newsroom employees were plotting. He advised her that the Times did not expect employees to stay with the newspaper forever and that if she was unsatisfied she could go elsewhere. He also said that if the employees had a union movement going on, it would not be proper for him to talk to her. The ALJ credited Brown's testimony, finding Tobin's remarks to be a "veiled threat that if the employee persisted in her activities, her job status would be in jeopardy."

The Board found that Managing Editor Andrews had interrogated employees in violation of the Act in three instances. In mid-October he called reporter Mary Kay Brown into his office and stated he knew she was involved with the Union. She told him he did not have the right to question her and he answered that he could question her but she did not have to answer. Thereafter the Union organizing committee drafted a note to Andrews warning him not to interrogate employees about Union activities. Andrews also called reporter Frank Gerjevic into his office to inform him of a raise and to state that he appreciated Gerjevic's work because he was quiet and did not want to vote. Finally Andrews asked another reporter, John Matthews, if he had made up his mind about the Union, noting that it might not be

legal for him to ask. Matthews gave an evasive answer.

The Board also found that the City Editor, Michael Todd, had unlawfully interrogated three Times employees, reporter Carl Sampson, reporter William Wilson and his wife Sarah Wilson. These instances were found to violate the Act partially because the Company's animus against the unionization was well known and because no legitimate purpose was served by the questioning.

In late December, Director of Circulation Jules Molenda divided the duties of the departing office manager in the circulation department among three "group leaders," Elaine Craft, Elaine Moore, and Betty Broste. According to testimony credited by the ALJ, he told them that their jobs were probationary. At the same time he inquired if the three employees were pro-Union, cautioning them that they did not have to answer that question. The Board determined that the question contained an implied threat that the permanence of the promotion depended upon their refusal to support the Union.

The last incident of interrogation occurred when an employee, Lynn Symonds, inquired of the Personnel Manager, Martha Lloyd, if there was a job opening at the Times for her brother. Lloyd asked her if her brother was pro-Union. The Board found that this question carried the implication that the Times considered the Union sympathies of an applicant for employment, despite its official policy to the contrary.

intimidated any employees in the exercise of their guaranteed rights; and third, that under the Board's "critical period" doctrine the interrogations conducted before the filing of the election petition should not be considered unfair labor practices or, at least, should not be relied upon in justifying a bargaining order.

### 1. Substantial Evidence

After a careful review of the extensive testimony at the hearings before the ALJ, the Court concludes that the Board's determination of facts in each incident is supported by substantial, although not uncontradicted, evidence. The Company points to testimony in the record that would tend to undermine the particular factual findings. In each instance, however, the conflict in testimony resolves to a question of evaluating the credibility of the witnesses. The ALJ is in the best position to evaluate which witness is recalling the facts most accurately, and the Court cannot conduct a *de novo* review of the testimony to make different credibility determinations. *NLRB v. Adams Delivery Service, Inc.*, 623 F.2d at 99.

### 2. Intimidation

The Company argues that the Board's findings should be overturned because there was no evidence that the interrogations actually had a coercive effect on the employees. Indeed, in two instances the interrogators indicated that the employees did not have to answer the questions.[7] Thus, it argues, the interrogations did not affect the outcome of the election and should not be considered unfair labor practices.

■ The short answer to this argument is that interrogation violates the Act if it has a tendency to intimidate employees in the exercise of their protected rights, even if there is no evidence of actual intimidation. *See Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1080 (9th Cir. 1977); *NLRB v. Bell Manufacturing Division, Di Giorgio Leisure Products, Inc.*, 483 F.2d 150, 151–53 (9th Cir. 1973). As this Court explained in *Amalgamated Meat Cutters and*

*Butcher Workmen of North America, Local No. 364 v. NLRB*, 435 F.2d 668, 669 (9th Cir. 1970),

> [i]n order for an employer's interrogation of employees to constitute unfair labor practices under section 8(a)(1) it must be associated with express or implied threats or promises, or form part of an overall pattern tending to restrain or coerce employees with regard to their protected activities.... When the inquiries are not undertaken in a threatening manner but are only isolated instances free of coercion and without any systematic intimidation in the background, they are not unlawful.

The burden rests on the General Counsel to prove that the interrogations violated the Act. *See Hughes & Hatcher, Inc. v. NLRB*, 393 F.2d 557, 563 (9th Cir. 1968).

In this case, the Board found that each interrogation incident was associated with an implied threat. Moreover, it found that the interrogations were part of an overall systematic pattern of intimidation of employees. These findings are supported by substantial evidence and, therefore, justify the conclusion that the interrogations were unfair labor practices even though there was no evidence that employees were actually intimidated by the interrogations.

### 3. The "Critical Period" Doctrine

Finally, the Company argues that under the Board's "critical period" doctrine, interrogations occurring before the filing of the election petition should not be considered unfair labor practices and should not be considered in determining if the results of the election should be set aside and the Company ordered to bargain. It relies upon *Ideal Electric and Manufacturing Co.*, 134 N.L.R.B. 1275, 1278 (1961), wherein the Board

> concludes, in all the circumstances, that the date of filing of the petition ... should be the cutoff time in considering alleged objectionable conduct in contested cases. From that time, when the Board's processes have been invoked and a prompt election may be anticipated pur-

---

7. *See note 6 supra.*

suant to present procedures, we believe that conduct thereafter which tends to prevent a free election should appropriately be considered as a postelection objection.

■ To the extent that the Company is arguing that the "critical period" doctrine is a variety of statute of limitations imposed by the Board on unfair labor practices, it is clearly wrong. The only statute of limitations upon unfair labor practice charges is that found in Section 10(b) of the Act, 29 U.S.C. § 160(b), which provides that the Board cannot issue a complaint "based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . ." *See Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960). As long as this requirement is satisfied, the Board is free to find that unfair labor practices have been committed regardless of the date of the filing of an election petition. Indeed, an employer can commit an unfair labor practice in some instances even if there is never an election petition filed.

■ To the extent that the Company is arguing that the "critical period" doctrine prevents these "pre-filing" interrogations from being considered in issuing a bargaining order, it is also incorrect. It is not clear whether the Board considers the "critical period" doctrine expressed in *Ideal Electric* to be a rule of evidence or a rule of substantive law. *See Catholic Medical Center of Brooklyn and Queens, Inc. v. NLRB*, 589 F.2d 1166, 1170–74 (2d Cir. 1978). This Court, however, has considered the *Ideal Electric* "critical period" doctrine and found that it

is simply an evidentiary device calculated to render irrelevant upon a post election contest, conduct "too remote" to have interfered with the employees' exercise of the free choice guaranteed by Sec. 7 of the Act.

*NLRB v. R. Dakin & Co.*, 477 F.2d 492, 494 (9th Cir. 1973). The Court concluded that we were

not prepared to give our approval to a rule which flatly bars the consideration of all pre-petition misconduct, particularly where, as here, the Regional Director concluded, and the Board affirmed, that such alleged misconduct "raised a substantial and material issue of fact" regarding the validity of the election.

*Id.* Accord, *NLRB v. Lawrence Typographical Union No. 570*, 376 F.2d 643, 652 (10th Cir. 1967).[8] Here, the Board considered that the events that occurred before the petition was filed were relevant to the fairness of the election. All of the incidents found to be unfair labor practices by the Board were within a month and a half of the filing of the petition, and all arose out of the Company's concern about the organization drive that led to the petition and, ultimately, to the election. This Court cannot say, as a matter of law, that these events were too remote to have had an effect on the election outcome. Nor will the Court require the Board to enforce an inflexible *per se* rule to disregard incidents before the filing of the election petition. Therefore, the Company's objections based upon the "critical period" doctrine are rejected.

The Court has considered the other objections raised to the Board's finding that these interrogations constituted unfair labor practices and finds them without merit.

## B. *SURVEILLANCE AND THREATS*

■ Director of Circulation Jules Molenda urged Yvette Hamilton, then office manager of the circulation department, to have some employees attend a Union meeting and report back. She persuaded two employees to attend the meeting and Molenda, on his own, persuaded two others to attend as well. The Board's conclusion that this activity constituted an unfair labor practice is supported by substantial evidence. *Cf.*

---

**8.** The Board itself has not invariably followed the *Ideal Electric* rule when it felt circumstances warranted considering pre-petition conduct. *See, e. g., Baker Machine & Gear, Inc.*, 220 N.L.R.B. 194, 207 (1975); *Servomoton of Co-*

*lumbus, Inc.*, 219 N.L.R.B. 504, 505 (1975); *Willis Shaw Frozen Express*, 209 N.L.R.B. 267 (1974); *Weather Seals Inc.*, 161 N.L.R.B. 1226 (1966).

*NLRB v. Randall P. Kane, Inc.*, 581 F.2d 215, 218 (9th Cir. 1978).

City Editor Michael Todd told Sarah and William Wilson, both Times employees, that management was watching who attended NLRB hearings on the representation petition. He told them he did not think Sarah Wilson should attend, although it would be all right for William Wilson to attend, because his job was covering labor news. Creating the impression of surveillance of union activities can be as coercive as actual surveillance and, therefore, constitute an unfair labor practice. *See NLRB v. Miller Redwood Co.*, 407 F.2d 1366, 1368 (9th Cir. 1969). Substantial evidence supports the Board's conclusion that Todd committed an unfair labor practice.

The Board also found that Director of Circulation Molenda, at a group meeting of the circulation department, threatened employees that if the Union won the election it would be cheaper to replace the composing room employees with a computer. Larry King, a lower-level mailroom supervisor, threatened two mailroom drivers that, if the Union won the election, at least one of them would be laid off because the company could not afford both. The Board has the primary responsibility to distinguish between a threat, which is an unfair labor practice, and a prediction of the probable consequence of unionization, which is not. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969); *NLRB v. General Telephone Directory Co.*, 602 F.2d 912, 915 (9th Cir. 1979). Prior anti-union policies or sentiments by the Company can be considered in determining if the particular statement is a prediction or a threat. *See e. g., NLRB v. Lenkurt Electric Co.*, 438 F.2d 1102, 1107 (9th Cir. 1971). In both of these instances, ample evidence supports the Board's conclusion that unfair labor practices were committed.

### C. THE TERMINATION OF ANN GABLER

Ann Gabler was an education reporter with the Times. During the Union election campaign she decided to return to school to become a paramedic. On several occasions in December 1976, she asked Times managers if she could continue as a part-time worker after beginning school in mid-January. On December 6, 1976, Managing Editor Andrews told her that he thought something could be worked out. On the next day, City Editor Todd indicated that he could use her on Saturdays. According to testimony credited by the ALJ, on the same day, General Manager Tobin told her that her plan to work part-time would be "fine." Gabler again discussed the question with Andrews in early January and received an indication that it could be worked out.

Sunday Editor Michael Doogan testified that shortly before Gabler was due to stop working full-time he asked Andrews if she could work for him on Saturday nights. Andrews replied, "We don't know where she is on this union business. She tells [Tobin] one thing and other people something else." He instructed Doogan to find out what her Union sentiments were. Thereafter Andrews told Gabler that she could not work part-time, although he indicated that there might be a position after the election. She replied that if she were still working she would vote for the Union and, according to Gabler's testimony, Andrews replied that "elections are won or lost by a single vote." Finally, the Personnel Manager testified that the Times management had placed Gabler's name on the "undecided" list regarding her Union sentiments.

The pendency of a union representation election does not prevent management from carrying on its business in the normal fashion. A company may continue to make business decisions for good reasons, for bad reasons, or for no reasons at all, so long as the decisions are not motivated by anti-union discrimination or a desire to punish activities protected by the Act. *L'Eggs Products, Inc.*, 619 F.2d at 1341. An employer is free to terminate[9] an employee

---

**9.** Both parties discuss this issue as a termination question, even though Gabler voluntarily left her full-time employment with the Company. The Board's remedy for the unfair labor practice requires that the Company reinstate her in a job on a part-time basis, or the equivalent.

unless anti-union animus is the moving or "but for" cause. *See NLRB v. Adams Delivery Service, Inc.*, 623 F.2d at 99; *Stephenson v. NLRB*, 614 F.2d 1210, 1213 (9th Cir. 1980); *Western Exterminator Co. v. NLRB*, 565 F.2d 1114, 1118 (9th Cir. 1977). The General Counsel bears the burden of proving that the discharge was in violation of the Act. *See NLRB v. Adams Delivery Service, Inc.*, 623 F.2d at 99. The Board must base the finding on more than a mere circumstantial inference drawn from a general history of anti-union activities by the Company. *NLRB v. Best Products Co., Inc.*, 618 F.2d 70, 74 (9th Cir. 1980).

■ In this case the ALJ credited the testimony of Gabler and Doogan and found that "the employee's position regarding the Union was a critical factor in management's decision not to honor her request for part-time employment." He found that she would have been offered the part-time job if management had been certain that she took an anti-Union stance. Thus, the ALJ concluded and the Board agreed, that the Company impermissibly based the employment decision upon Gabler's failure to express an anti-union preference, in violation of § 8(a)(3) of the Act. This finding is supported by substantial evidence and will not be overturned.

### D. *GRANTING BENEFITS PRIOR TO THE ELECTION*

On July 26, 1976, well before the unionization drive began, the Company formulated a new program of wage reviews, which was to take effect in September of that year. The program called for regular reviews of all employees at various intervals, depending upon the length of employment and job description. The Board did not find that this program violated the Act. However, the Board found that the Company deviated from the plan in such a way as to grant an inordinate number of wage increases and promotions in the two days immediately preceding the election. Twenty-eight employees, or fifteen percent of the bargaining unit, received wage increases on January 18 or 19, 1977. Eleven of the wage increases were granted three or more weeks later than the time prescribed in the wage review plan timetable. Six of the increases were granted two or more weeks earlier than called for in the timetable. The Board found that these wage increases were "saved" to have the maximum impact on the election results and that, therefore, they constituted unfair labor practices.

■ Granting a regularly scheduled wage increase does not become an unfair labor practice merely because a union representation election is pending. *Oshman's Sporting Goods, Inc. v. NLRB*, 586 F.2d 699, 705 (9th Cir. 1978); *Allen v. NLRB*, 561 F.2d 976, 981 (D.C.Cir.1977); *NLRB v. Styletek, Division of Pandel-Bradford, Inc.*, 520 F.2d 275, 280 (1st Cir. 1975); *NLRB v. Gruber's Super Market, Inc.*, 501 F.2d 697, 701 (7th Cir. 1974). However, § 8(a)(1) prohibits "conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). *Accord, NLRB v. Olympic Medical Corp.*, 608 F.2d 762, 764 (9th Cir. 1979). The motive of the employer is critical in determining whether the granting of a wage increase prior to an election is an unfair labor practice. An important indicator of that motive is whether there has been a change from the status quo. *See Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1129 (9th Cir. 1978). Moreover, the law is well established that there is a presumption of illegal motive adhering to wage increases granted prior to an election. *Id.; NLRB v. Newman-Green, Inc.*, 401 F.2d 1, 3 (7th Cir. 1968). As one court has observed:

The Board has long required employers to justify the timing of benefits conferred while an election is actually pending. Justifying the timing is different from merely justifying the benefits generally.

Wage increases and associated benefits may be well warranted for business reasons; still the Board is under no duty to permit them to be husbanded until right before an election and sprung on the employees in a manner calculated to influence the employees' choice.

*NLRB v. Styletek, Division of Pandel-Bradford, Inc.,* 520 F.2d at 280.

■ In this case the large percentage of the bargaining unit that received wage increases, coupled with the several weeks variation from the Company's own schedule for those increases, coupled with the extremely close proximity to the election provides ample evidence to support the Board's conclusion that the Company intended the wage increases to influence voting in the election. The Company's explanation that the fact the wage increases occurred in the two days prior to the election was merely coincidental is incredible. Therefore, the Court affirms the determination of the Board that these wage increases constituted unfair labor practices.

### III. *THE BARGAINING ORDER*

Relying on *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Board set aside the election and ordered the Company to bargain with the Union. Such an extreme remedy is authorized where an employer's conduct during an election campaign is so disruptive as to taint any "re-run" election. In *Gissel* the Court identified two categories of cases in which such an order is warranted. In the first category the employer's unfair labor practices are so "outrageous" and "pervasive" that a bargaining order is almost always warranted. *Id.* at 613–14, 89 S.Ct. at 1939–40. In the second category the employer's conduct is less flagrant but still bad enough to tend to undermine the free election process. In this latter category the Board can issue a bargaining order if the Union demonstrates that it represented a majority of the unit employees who signed valid union authorization cards. The Court also identified a third category in which the employer's practices will not merit a bar-

gaining order because of their minimal effect on the election process. *Id.* at 614–15, 89 S.Ct. at 1940. *See NLRB v. Chatfield-Anderson Co., Inc.,* 606 F.2d 266, 268 (9th Cir. 1979) (delineating the three *Gissel* categories); *NLRB v. Pacific Southwest Airlines,* 550 F.2d 1148, 1151 (9th Cir. 1977) (same).

■ The Company's activities in this case were not outrageous enough to fit into the first *Gissel* category. Therefore, the bargaining order will be enforced only if there is sufficient evidence in the record to support the conclusion that the Union enjoyed majority status at some time prior to the election and that the employer's unfair labor practices were sufficiently pervasive and outrageous to undermine the opportunity for a fair "re-run" election.

### A. *THE UNION'S MAJORITY STATUS*

The Board found that by November 15, 1976, the Union had obtained 97 valid authorization cards in a unit of 181 employees. As a majority would consist of 91 employees, at least seven of the authorization cards would have to be invalidated to destroy the Union's majority. The Company's primary argument is that some fourteen of the authorization cards were invalid because the employees who signed them believed that the cards only requested an election and did not authorize the Union to represent them in collective bargaining with the Company.

The Union used two different authorization card forms, one of which was "single purpose" and the other of which was "double purpose." [10] Both cards clearly and unambiguously indicate the signer's intent to be represented by the Union in collective bargaining. In *Gissel* the Supreme Court noted:

employees should be bound by the clear language of what they sign unless that language is deliberately and clearly cancelled by a union adherent with words calculated to direct the signer to disre-

---

**10.** *See* note 2 *supra.*

gard and forget the language above his signature.

395 U.S. at .606, 89 S.Ct. at 1936. The Company argues that Union organizer William Coleman created a false impression about the purpose of the cards at group meetings, that individual Union adherents told particular employees that the only purpose for the card was to secure an election and that several employees believed that the only purpose of the card was to gain an election, although they could not remember exactly what was told to them.

As to William Coleman, a review of the record reveals ample evidence to support the Board's finding that he fully and fairly explained the representation function of the authorization cards. The fact that several employees who attended group meetings could not recall such explanation is not sufficient to require this Court to overturn the Board's factual determination.

■■■ As to the individual solicitations, the rule is that where an employee is told that his card will be used only to obtain an election the card is not valid, but where he is not actually told that, but his only intent is to obtain an election, the card is valid. See NLRB v. Randall P. Kane, Inc., 581 F.2d 215, 219–20 (9th Cir. 1978); NLRB v. South Bay Daily Preeze, 415 F.2d 360, 365–67 (9th Cir. 1969), cert. denied, 397 U.S. 915, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970). A careful reading of the record reveals that only four employees (Kathleen Digel, Patricia Kieferly, Beverly Gearhart and Joseph Maguire) testified that they were actually told that the only purpose was to obtain an election. If the ALJ and Board had credited the testimony of these four employees, their authorization cards would be invalid. However, the ALJ and Board did not credit their testimony and their findings are entitled to great weight by this Court. Moreover, even if all four cards had been excluded, the remaining cards would have been sufficient to constitute a Union majority.

Seven other employees (Kathleen Ann Bibler, Lynn Conway, Betty Mead, John Spahr, Beth McCullough, Linda Goodson and Patricia Lindsey) recall being told that the cards would be used to obtain an election but fail to recall if they were told that it was the only purpose of the cards. In the absence of direct testimony that the employees were improperly solicited, it would be impossible for this Court to overturn the Board's factual finding and substitute a finding that Union adherents had "deliberately and clearly" cancelled the card's Union authorization purpose. Therefore, the Board's finding that the authorization cards of these seven employees were valid will not be changed.

The remaining objections of the Company, that the Union's majority status is tainted by the efforts of supervisors on the behalf of the Union, that the Board improperly refused to allow the Company to see affidavits and questionnaires given to it by employee-signers who did not testify, and that one of the unit members, Ray Tyson, should have been considered a manager and, therefore, not eligible to participate as an employee in the election, are not well founded. Therefore, we find that the Union did enjoy majority status as of November 13, 1976.

B. *PERVASIVE UNFAIR LABOR PRACTICES*

In *Gissel* the Court emphasized that the determination of when to issue a bargaining order is within the discretion of the Board. 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32; *NLRB v. Peninsula Ass'n for Retarded Children and Adults*, 627 F.2d 202, 204 (9th Cir. 1980); *NLRB v. Pacific Southwest Airlines*, 550 F.2d at 1150–51. Although that discretion is not unbounded, the Court should enforce a bargaining order where the unfair labor practices are pervasive and severe enough to fit in either the first or second *Gissel* category.

In this case, the Board explained its decision to issue a bargaining order, based on the range of unfair labor practices that it had found, as follows:

The numerous and persistent acts of unlawful interrogation by higher level management, the selective hiring policy based upon unlawful questioning of job applicants or employees seeking to arrange

employment interviews for job applicants, the use of employees to engage in surveillance, and the creating of an impression among employees that management was engaging in surveillance of their union and protected activities, as well as the threats of loss of employment are collectively sufficient to warrant a determination that a fair rerun election could not be held. Equally pernicious ... is management's manipulative use of the wage review program to grant pay increases to groups of employees in all departments in an effort to undermine their support for the Union and influence the outcome of the election. It is reasonable to conclude that the total cumulative effect of these unfair labor practices, coupled with the additional unlawful refusal to employ Gabler on a part-time basis, will be a lasting one, and the conditions necessary for providing a fair expression of employee sentiment in a rerun election will not be achieved by a traditional cease and desist order.

The total number, severity, and immediacy of the unfair labor practices in this case far exceeds those in *NLRB v. Peninsula Ass'n for Retarded Children and Adults,* 627 F.2d at 204, (where the violations were characterized as "relatively mild"), and in *NLRB v. Chatfield-Anderson Co., Inc.,* 606 F.2d at 269, (where the most severe violations were "mitigated" and others were "almost trivial"), two recent cases in which we refused to enforce Board bargaining orders.

The wage increases, which were granted immediately prior to the election, are the most significant among the many unfair labor practices cited by the Board. It is unlikely that those who received such benefits, or who heard of them, will forget that it is the Company that has the final word on wage increases—and decreases.

In addition, we are not persuaded that the harmful effect of the Company's unfair labor practices has been dissipated by the fact that two of the Company's representatives who committed some of the unfair labor practices (supervisors King and Molenda) have left its employ. Several of the unfair labor practices were committed by high level management personnel who did not, as did the management personnel in *Chatfield-Anderson Co., Inc.,* choose to disavow their coercive conduct before the election. Moreover, the unlawful wage increases were granted by management, not by the departed supervisors. *Cf. NLRB v. Peninsula Ass'n for Retarded Children and Adults,* 627 F.2d at 205 (solicitation manager "directly responsible" for violations no longer with employer). Therefore, it appears unlikely that the effect on the employees of the unfair labor practices of management has been softened by the departure of two supervisors.

The Board's finding that a fair rerun election would not be possible is, therefore, supported by substantial evidence.

The Board's entire order, including the bargaining order, is enforced.